UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| THOMAS MARTONE, and all other individuals similarly situated, | § § § | |
| Plaintiff, | § § | CLASS ACTION COMPLAINT |
| v. | § § | CIVIL ACTION NO. 1:15-CV-877 |
| WHOLE FOODS MARKET, INC., JOHN ELSTROTT, JOHN P. MACKEY, WALTER E. ROBB, III, SHAHID HASSAN, STEPHANIE KUGELMAN, JONATHAN SEIFFER, MORRIS SIEGEL, JONATHAN SOKOLOFF, RALPH SORENSON, GABRIELLE GREENE-SULZBERGER and WILLIAM TINDELL III, | § § § § § § § § § § § § § | JURY TRIAL DEMANDED |
| Defendants. | | |

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff Thomas Martone ("Plaintiff"), by and through his attorneys, files this Complaint on behalf of himself and other similarly situated current and former employees of Whole Foods Market Inc. ("Whole Foods" or the "Company"), or its predecessor companies, who were participants in and beneficiaries of the Whole Foods Market Growing Your Future 401(k) Plan Restated Effective as of October 1, 2004, with Amendments adopted through January 2012 (the "Plan") and who invested in the Company Stock Fund (the "Fund") during the period of January 1, 2010 through July 30, 2015, inclusive (the "Class Period"). He alleges the following based on the investigation of his counsel, which included a review of the Plan's governing documents; the Plan's annual

1

reports filed with the United States Securities and Exchange Commission ("SEC") and U.S. Department of Labor; discussions with Plan participants; other SEC filings by Whole Foods; other lawsuits against Whole Foods; press releases and other public statements issued by Whole Foods; and media reports about Whole Foods. Plaintiff believes that substantial additional evidentiary support exists and will emerge for the allegations set forth herein after there has been a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This is a class action brought pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against defendants Whole Foods and the members of its Board of Directors, including its two co-Chief Executive Officers ("co-CEO"), by participants in the Plan, and on behalf of the Plan, to recover many millions of dollars of damage suffered in their 401(k) retirement accounts due to breaches of fiduciary duties owed to them. The fiduciaries of the Plan, who owed "the highest duty known to the law" to Plan participants, breached those duties throughout the Class Period when they knew that Whole Foods' stock price had become artificially inflated in value, and therefore was a wholly imprudent investment for employees' retirement savings, yet took no action whatsoever to protect Plan participants from the harm this artificial inflation would inevitably cause.

2. Whole Foods is a retailer of natural and organic foods. The Company's stores offer produce and flowers, grocery, meat, seafood, bakery, prepared foods and catering, coffee, tea, beer, wine, cheese, nutritional supplements, vitamins, and body care products, as well as lifestyle products, including books, pet products, and household

products.  As of May 7, 2015, the Company had approximately 417 stores worldwide.  Its shares trade on the NASDAQ under the ticker symbol "WFM."

3.      During the Class Period, Whole Foods grossly overstated its revenues, profits and growth profits through systemic, illegal overcharging of its customers, and made false representations about its quality controls, values, brand value and reputation. Whole Foods regularly misstated the weight of pre-packaged food on which prices were based to illegally overcharge customers, and had insufficient and flawed quality control systems in place to prevent this fraud.  Upon information and belief, it was Whole Foods' pressuring of its local store owners to hit certain revenue and profit targets that resulted in systematic overcharging of customers across multiple states.  This systematic overcharging inflated Whole Foods' bottom line and enabled substantial growth in sales revenues, profits, new stores and a large appreciation in Whole Foods' stock price throughout the Class Period.

4.      This growth and seemingly successful performance, however, were based on Whole Foods' improper and illegal overcharging regime.  Whole Foods was only able to promulgate its high-flying financial performance and expand its operations because its revenue and sales figures were falsely stated. When the truth finally emerged—not simply when Whole Foods admitted to, and apologized for, the systematic overcharging of its customers, but when it finally released financial and operating results that reflected books that were no longer cooked—Whole Foods' artificially inflated stock price returned to earth, falling $4.74 per share, more than 11%, on one day's trading.  The stock was down more than 20% from its Class Period peak.

5.      The Plan is a defined contribution plan sponsored by Whole Foods for eligible employees of the Company.  Among the investment options available to Plan participants is the Company Stock Fund, which, according to the Plan, "invests solely in the common stock of the Company."

6.      Like any ERISA plan, the Plan designated certain fiduciaries of the Plan, who were charged with monitoring and overseeing all of the Plan's investments, including the Company Stock Fund, and communicating with Plan participants regarding these investments.  Under the Whole Foods Plan, these fiduciaries were the Company's Board of Directors, a body that included the co-CEOs of the Company, as well as the Company itself.  These fiduciaries are the defendants in this case.

7.      Among the most important duties of the Whole Foods' Plan fiduciaries was ensuring that each Plan investment option remained prudent—including the Company Stock Fund.  Notwithstanding the Plan's admonition that the Company Stock Fund invest "solely" in Whole Foods stock, or any other language in the Plan that attempted to take decision-making responsibility out of the hands of the Plan's fiduciaries, each Plan fiduciary was obliged under the law to ensure that investment of employee retirement funds in the Company Stock Fund remained a prudent option based on what each fiduciary knew at the time.  This responsibility to ensure the prudence of the Company Stock Fund cannot be delegated or abnegated or otherwise avoided.

8.      Defendants were well-positioned to be aware of the Company Stock Fund's imprudence during the Class Period.  The two co-CEOs were directly responsible for the financial reporting that was falsely enhanced by Whole Foods' overcharging program; upon information and belief, the other Directors were involved in at least the review of that

reporting as well.  And of course one of the fiduciaries of the Plan was Whole Foods itself, whose owned and operated stores were responsible for directly carrying out the overcharging scheme.

9.     Defendants set the performance targets that made overcharging necessary; they knew that the Company lacked sufficient quality controls to prevent overcharging abuse—particularly after such abuse was uncovered in California in 2012; they knew how the Company was benefitting from the results generated by the overcharging abuse; and they knew that these goosed results were causing the Company's stock price to trade at an artificially high price.

10.    Thus, when defendants became aware of Whole Foods' systematic overcharging of customers, and how that overcharging was falsely boosting the Company's financial performance and concomitantly the value of its publicly-traded stock, they should have immediately understood that this fraudulent performance had rendered Whole Foods stock an imprudent investment for Plan participants.

11.    Any Plan participant who purchased shares of the Company Stock Fund during the time when the stock was artificially inflated was buying it at a falsely high price. When the fraud was inevitably revealed, and the stock price returned to a level that actually reflected its value, those purchasers suffered considerable losses and were damaged as a result.  Even if the stock price were to recover at some point down the road, those purchasers would miss out on some measure of gains because their purchase price had been artificially high.

12.    Plan participants who simply held shares of the Company Stock Fund during the Class Period were damaged as well, because they held an imprudent investment

during a time when they could have shifted their holdings into a different, prudent investment trading at an accurate value, and thus their damages constitute the difference between the performance of that other prudent investment and the imprudent one they actually held.

13.     Defendants should have recognized that Whole Foods' artificially inflated stock would ultimately result in the aforementioned injuries to Plan participants.  And once they recognized that fact, they should have taken immediate action to prevent, or at least mitigate, those injuries.

14.     Defendants could have taken at least two actions to fulfill their fiduciary duty.  First, they could have acted to correct the artificial inflation of the Company's stock, which, in turn, would have made the Company Stock Fund once again a prudent investment.  In other words, defendants simply could have told the public the truth.  Again, defendants were well-positioned to take this step.  After all, who better than the Board of Directors to effectuate truthful and accurate financial reporting to the public?  Such a task is one of the basic functions of any Board.  Likewise, the co-CEOs, as Sarbanes-Oxley co-signatories of Whole Foods' SEC filings, certainly could have corrected those reports for which they were responsible so that they would no longer reflect falsely inflated results due to systematic overcharging of customers.  And again, the Company itself, also a fiduciary of the Plan, could have easily taken this step as well—acting through its co-defendants or other of its corporate officers to ensure that its financial reporting was not falsely inflated.

15.     Disclosure of this kind would have not only been consistent with defendants' obligations under ERISA as fiduciaries, but with the Company's obligations

under the federal securities laws—which, after all, require publicly-traded companies to be truthful and accurate in their financial reporting.

16.     Defendants cannot excuse their failure to tell the truth by claiming that, at the time, they could reasonably thought it would have done more harm than good to do so. Certainly disclosing the truth about a fraud is likely to have a negative impact on a company's stock price, but that negative impact will only get worse the longer the fraud goes on.  Neither ERISA nor the securities laws permit the ongoing sanctioning of fraud under any circumstances.

17.     Defendants could have taken other actions to protect Plan participants as well.  Whole Foods had the power under the Plan to appoint an "Investment Manager" to oversee Plan investment options, including the Company Stock Fund.  However, such a third party was still required to follow any investment guidelines issued to it by the Company.  Thus, Whole Foods could have issued new investment guidelines during the Class Period closing the Company Stock Fund to new investments until such time as the fund was no longer imprudent (that is, until the Company stock price was no longer artificially inflated).

18.     Both the Company and the Board of Directors, as Plan fiduciaries, had the power to amend the Plan itself at any time, and thus could have amended the Plan to suspend new investments in the Company Stock Fund, or remove the Company Stock Fund as an investment option altogether, until such time as the fund was no longer imprudent.

19.     Preventing new investment in the Company Stock Fund would not constitute insider trading under the securities laws.  To the extent it triggered some disclosure obligation of the Company, that would be a good thing considering that

disclosure of the truth was the other option defendants could have exercised to protect Plan participants from the harm of the Company's artificially inflated stock price.

20.     Instead, Whole Foods and the Directors allowed their employee Plan participants to whom they owed their fiduciary duties to purchase and hold an imprudent investment throughout the Class Period without taking action to protect them in any way. Whole Foods' stock price went from $13 a share to $60 a share at its peak, and dropped more than 11% when the truth about Whole Foods' financial performance finally emerged. Meanwhile, other investments in the Plan have fared far better, and Whole Foods faces lawsuits, quality control reforms, significant layoffs and a struggle to repair the serious damage to its reputation and credibility—the "trust [that] was lost" according to co-CEO Robb.  Whole Foods and its directors, including its co-CEOs, are directly responsible as fiduciaries for this enormous harm that their breaches of their duties caused.

## II. JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

22.     Venue is proper in this district pursuant to ERISA § 501 (e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and defendant Whole Foods is incorporated in Texas and resides and maintains its primary place of business in this district.

## III. THE PARTIES

23.     Plaintiff Thomas Martone is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).   He is a former employee of Whole Foods who was

and continues to be a participant in the Plan.  He purchased and held shares of Whole Foods's stock in his Plan retirement savings account during the Class Period.

24.     Defendant Whole Foods is a Texas corporation with its principal executive offices located at 550 Bowie Street, Austin, Texas 78703. Whole Foods's common stock trades on the NASDAQ under the ticker symbol "WFM."

25.     At all times, Whole Foods is and was the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).  Additionally, Whole Foods was fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had discretionary authority and control regarding the management of the Plan and the Plan's assets.

26.     At all times, John Elstrott is and was the Chairman of the Board of Directors of Whole Foods and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control regarding the management of the Plan and the Plan's assets.

27.     At all times, John P. Mackey is and was the Co-Chief Executive Officer and a Director of Whole Foods and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control regarding the management of the Plan and the Plan's assets.

28.     At all times, Walter E. Robb, III is and was the Co-Chief Executive Officer and a Director of Whole Foods and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control regarding the management of the Plan and the Plan's assets.

29.     At all times, Shahid Hassan is and was a Director of Whole Foods and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control regarding the management of the Plan and the Plan's assets.

30.     At all times, Stephanie Kugelman is and was a Director of Whole Foods and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because she had discretionary authority and control regarding the management of the Plan and the Plan's assets.

31.     At all times, Jonathan Seiffer is and was a Director of Whole Foods and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control regarding the management of the Plan and the Plan's assets.

32.     At all times, Morris Siegel is and was a Director of Whole Foods and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control regarding the management of the Plan and the Plan's assets.

33.     At all times, Jonathan Sokoloff is and was a Director of Whole Foods and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control regarding the management of the Plan and the Plan's assets.

34.     At all times, Ralph Sorenson is and was a Director of Whole Foods and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he

had discretionary authority and control regarding the management of the Plan and the Plan's assets.

35.     At all times, Gabrielle Greene-Sulzberger is and was a Director of Whole Foods and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. §1002(21)(A) because she had discretionary authority and control regarding the management of the Plan and the Plan's assets.

36.     At all times, William Tindell III is and was a Director of Whole Foods and a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he had discretionary authority and control regarding the management of the Plan and the Plan's assets.

### IV. WHOLE FOODS GROWING YOUR FUTURE 401(K) PLAN

37.     The Plan is a defined contribution benefit plan that is sponsored by Whole Foods for eligible employees and is subject to ERISA.  Employees can defer up to 100% of their compensation into the Plan, and Whole Foods will make an automatic contribution for some employees and a matching contribution in an amount determined by the Directors.

38.     Section 8.1 of the Plan designates Whole Foods itself the Plan Administrator unless the Board of Directors acts to appoint a committee of three or more persons "to serve at their pleasure."  The Directors retain oversight of these committee members, including the power to issue "written guidelines" to govern the appointment and removal of committee members.  Per section 2.1(u) of the Plan, the Plan Administrator is a "named fiduciary" of the Plan "designated to manage the operation and administration of the Plan."

39.     Section 11.2 of the Plan provides that the Directors can, if they wish, appoint an "Investment Manager" who is a "named fiduciary" for the assets entrusted to it for management.  The Investment Manager also "serves at the pleasure" of the Directors. Per Section 11.3, the Investment Manager has "exclusive management and control of the investments and/or reinvestments of the assets of the [Plan investments] *assigned to it in writing by the Company or its authorized delegate*."   Thus, although the Investment Manager has discretion over the management of investment options like the Company Stock Fund, this discretion only extends as far as the Company chooses to authorize.

40.     The Company's authority over the Investment Manager's decisions is confirmed by Section 11.5 of the Plan, which provides that Whole Foods is empowered to designate the investments that are available to the Plan participants, and has the authority, "at any time and from time to time, without amending the Plan, to modify, alter, delete or add to the alternatives available for investment…."   Section 11.5 further states that the investments must be "suitable as a proper and permissible investment" for contributions under ERISA.

41.     Section 16.1 of the Plan further reifies the authority of the Company over the Investment Manager, providing that the Company or its delegate has the "authority to appoint and remove the Investment Managers," and "make formal periodic reviews" of "the Investment Managers' investments and performance in order to determine if such investments and performance are in conflict with the provisions of ERISA."

42.     Thus, the Company can decide which investments should be within the purview of any Investment Manager; it can on its own add or remove any investment alternative; it can appoint and remove any Investment Manager; and it must periodically

review the performance of Investment Managers to ensure that they are complying with ERISA.

43.     But the powers of the Company and its Board as Plan fiduciaries are even more expansive than these.  Section 12.1 of the Plan states that the Company "may, without the assent of any other party, make from time to time any amendment or amendments to this Plan" so long as no Plan asset is diverted from the benefit of Plan participants.  Section 16.1 of the Plan states that the "board of directors of the Company shall have the sole responsibility for authorizing contributions under the Plan and the sole authority to amend or terminate the Plan, in whole or in part."

44.     Thus, throughout the Class Period, the Company and the Directors had the power and authority to amend the Plan, if necessary, to achieve compliance with ERISA or to correct any breaches of fiduciary duty toward Plan participants.  The Company could have used its authority over any third-party investment manager to close the Company Stock Fund to new investments while Whole Foods' stock price remained artificially inflated and therefore imprudent.  The Company or the Board could have amended the Plan itself to accomplish this same end.  Even language within the Plan that might suggest that the Company Stock Fund must be an available investment option could have been amended by the Company or the Board to prevent further harm to Plan participants.

## V. THE FIDUCIARY BREACHES

45.     Whole Foods operates as a retailer of natural and organic foods. The Company's stores offer produce and flowers, grocery, meat, seafood, bakery, prepared foods and catering, coffee, tea, beer, wine, cheese, nutritional supplements, vitamins, and body care products, as well as lifestyle products, including books, pet products, and

13

household products.   As of May 7, 2015, the company had approximately 417 stores worldwide.

46.     On June 24, 2015, New York City Department of Consumer Affairs ("NYCDA") announced it had uncovered "systematic overcharging for pre-packaged foods" at Whole Foods' eight New York City locations. On a survey of 80 different types of prepackaged products, NYCDA reported that it had found thousands of potential overcharging violations.

47.     The DCA provided specific examples of overcharging such as::

- The DCA inspected eight packages of vegetable platters, which were priced at $20 per package. Consumers who purchased these packages would have been, on average, overcharged by $2.50 — a profit of $20 for the eight packages. One package was overpriced by $6.15.

- The DCA inspected eight packages of chicken tenders, which were priced at $9.99 per pound. Consumers who purchased these packages would have been, on average, overcharged by $4.13 — a profit of $33.04 for the eight packages. One package was overpriced by $4.85.

- The DCA inspected four packages of berries, which were priced at $8.58 per package. Consumers who purchased these packages would have been, on average, overcharged by $1.15 — a profit of $4.60 for the four packages. One package was overpriced by $1.84.

48.     The DCA concluded that "New York City stores routinely overstated the weights of its pre-packaged products — including meats, dairy and baked goods — resulting in customers being overcharged."

49.     This public news of Whole Foods' systemic, illegal overcharging of customers in New York City became an enormous national news story.   At first, Whole Foods strenuously denied the charges, and stated it would fight them vigorously.  However, weeks later, in an effort to stem the damage to its brand and reputation and to restore consumer trust, Whole Foods' co-CEOs issued a video apologizing to customers.  The

scandal of this fraud has enormous impact on Whole Foods' financial results, its brand value and its reputation.

50.     However, after the news of the DCA charges broke, it became clear that Whole Foods's illegal overcharging was systemic and widespread, and not limited to simply New York City.  On July 24, 2015, Justin Wm. Moyer of the *Washington Post* in "Whole Foods Under Investigation For Overcharging In NYC," reported that Whole Foods's stores have received more than 800 violations during 107 separate inspections **since 2010**, according to a Daily News analysis of data obtained via a Freedom of Information Law request (emphasis added).

51.     Moyer additionally reported that Whole Foods had similar prior overcharging violations in California. In 2012, he reported that after a similar investigation in California in 2012 for overcharging customers due to improper weighting and quality control, Whole Foods paid $800,000 in penalties.  The multiple illegal overcharging violations on opposite sides of the country date back years.

52.     During the time of its illegal systemic overcharging since 2010, Whole Foods has reported enormous growth of its sales revenues, net income, new stores and stock price. Unfortunately, this success and growth was built on a fraud.  Whole Foods also built an established a national reputation for quality and trust due to its focus on healthy foods for consumers at reasonable prices.  This was also a fraud.

53.     For example, the following are figures from Whole Foods's 10-K annual reports filed with the SEC, which reflect its substantial growth:

| Fiscal Year | Sales Revenues (000s) | Net Income (000s) | Total Stores |
|---|---|---|---|
| 2010 | $9,005,794 | $245,833 | 299 |

| 2011 | $10,107,787 | $342,162 | 311 |
| 2012 | $11,698,828 | $465,573 | 335 |
| 2013 | $12,917,000 | $551,000 | 362 |
| 2014 | $14,194,000 | $579,000 | 399 |

54.     This growth reported by Whole Foods made it a highly attractive stock to investors, and caused its stock price to appreciate substantially.  As of January 1, 2010, Whole Foods' stock closed at $13.61 per share.  It has since appreciated substantially, splitting two-for-one on May 20, 2013, and peaking at $63 per share in October 2013. Before the truth about the overcharging came out, Whole Foods's stock was trading above $40 per share.

55.     In addition to its financial results, Whole Foods also made representations to investors during the Class Period about its quality controls and its values which were important to its overall brand value and corporate reputation.  For example, in its 2013 10-K, the Company stated, in part:

*Value Programs*
We remain committed to the highest quality standards and to providing a clear range of choices in every category, both of which we believe are important in driving our sales growth over the long term. In addition to offering our 365 Everyday Value brands, we have competitively matched prices on thousands of known value items, extended value choices to our perishables departments, promoted our regional and national one-day sales, and focused on improving customer awareness about the value we offer in our stores. We also have The Whole Deal, our printed value guide, available in all our stores in the U.S. and Canada, as well as online. The value guide features supplier-sponsored and Whole Foods Market store brand coupons, budget-conscious recipes, money-saving shopping and cooking tips, and Sure Deals that highlight everyday value pricing on high-quality products our customers love.
. . .
**Global Responsibility**

We seek to be a deeply responsible company in the communities where we do business around the world, providing ethically sourced, high-quality products and transparent information to our customers, reducing our impact on the environment, and actively participating in our local communities.

. . .

*Adverse publicity may reduce our brand value and negatively impact our business.* We believe our Company has built an excellent reputation as a food retailer, socially responsible corporation and employer, and we believe our continued success depends on our ability to preserve, grow and leverage the value of our brand. Brand value is based in large part on perceptions of subjective qualities, and even isolated incidents can erode trust and confidence, particularly if they result in adverse publicity, governmental investigations or litigation, which can negatively impact these perceptions and our business. In addition, our brand and reputation could be harmed by actions taken by our suppliers that are outside of our control.

56.     Whole Foods made the same or similar representations in its other 10-Ks filed during the Class Period.  These representations led investors to believe that the Company was not only committed to consumer values and corporate responsibility, but that it had the controls and systems to do so and the corporate culture among its employees that would prevent it from hiding quality control problems from the public.  These representations built a strong brand name, reputation and trust among its customers that was severely hurt when the scandal was revealed.

57.     During the Class Period, Whole Foods' statements above about its financial results, growth and values were materially false and misleading because they misrepresented and failed to disclose adverse facts, which were known to the Company and the Directors (or recklessly guarded by them), including that: (i) the Company routinely overstated the weight of its pre-packaged products and overcharged customers; and (ii) as a result of the foregoing, the Company's statements about Whole Foods's business, operations, and prospects were false and misleading and lacked a reasonable basis, resulting in a stock price during the Class Period which was artificially inflated in value.

58.     On July 2, 2015, in an effort to respond to the public relations damage done by the scandal, Whole Foods' co-CEOs Walter Robb and John Mackey—also defendant fiduciaries of the Plan—issued a video addressing the public.  In their video, the co-CEOs admitted that they "straight up made some mistakes," and they "apologize to our customers for any discrepancies that may have occurred."  They also discussed steps that they claimed the Company was taking to ensure future pricing accuracy, including increased employee training, third-party auditing and refunds to overcharged customers.  They stated that they would also increase training around the country because "we want to be perfect in this area."

59.     On July 29, 2015, Whole Foods issued a press release and filed a Form 8-K with the SEC announcing its second-quarter financial and operating results for 2015.  Co-CEOs Mackey and Robb also hosted an earnings call that day to discuss these results, which were well below expectations, particularly in light of the Company's multi-year strong performance.  The July 2015 8-K acknowledged that the "[w]eights and measures audit in New York City stores garnered national media attention"—in other words, the NYCDA announcement and Whole Foods' overcharging scandal by itself had hurt sales at Whole Foods stores during the last two weeks of the quarter.

60.     During the call, Whole Foods's co-CEO Robb acknowledged that the overcharging scandal had a material impact on both the Company's sales and brand value:

> [Analyst]: . . . [W]hen you look at the slowdown over the past five weeks, I guess, how can you guys be so precise that the New York audit is the primary factor? And I guess, more importantly, what steps are you taking to fix the problem given that it seems like it's bled into the first few weeks here of the fourth quarter?
>
> Walter Robb – Co-Chief Executive Officer & Director: . . . Well, again, I think in the comments here, we said that we – look, we try to give you the evidence in the chart there that showed the breakdown of the quarter, the weeks and the quarter,

the end of the quarter, the start of the quarter, and the start of the new quarter to help you get some visibility into the impact of it. Clearly, it affected the comps. Clearly, there's other factors that work here too in terms of the headwinds from the previous year strong sales and so forth. ***But by any measure, it has significant impact on our sales.***

[Analyst]: Has the New York City store started to bounce back at all or are you still facing the pressures?

Robb: We're not – I mean we're not really providing that level of detail as to the sales at this point, but I would say that – yeah, Glenda, maybe you want to...

Glenda Flanagan – Chief Financial Officer & Executive Vice President: ***Well, I just want to say that the impact was really felt across the whole country, not in New York City. This was national news.*** So, looking at what's happening in the New York market is really not the right way to look at it. It's looking at it across the whole company and you can see that for the first three weeks in Q4, although we've seen a little bit of uptick from there, it's still pretty low.

…

[Analyst]: I guess I would like to follow on [the previous] questions. The question isn't just how you get your people to do the right thing, because clearly you've done that. The question is how do you change customer perception that somehow Whole Foods can't be trusted?

[Robb]: Yeah, I mean I think that's a really fair question, Meredith. And then there's no – we're taking all the steps you can trust, has to be a trust is broken, it has to be rebuilt a step at a time and through solid, solid execution day in and day out. ***And there's no magic bullet for restoring whatever trust was lost*** . . . . (emphasis added).

61.     Whole Foods' misrepresentations to the public about its performance caused its stock price to trade at an artificially high value.  When the truth came out, the stock price fell, and Plan participants, such as plaintiff and the other members of the class, were significantly damaged as a result.  Plan participants relied on an honest stock price as well as public information about Whole Foods to evaluate its attractiveness as an investment option and purchased and held Company stock based on false and misleading information.

62.     Throughout the Class Period, defendants knew about the Company's misleading statements in its public filings with the SEC including its 10-K reports, and its failures to disclose the truth about the seriousness and extent of its illegal overcharging. Defendants knew that its stock price was artificially inflated by its false financial reports and lack of full material disclosure to the public, and that these made the Whole Foods Stock Fund an imprudent investment.

63.     The Company itself obviously knew about its own systematic overcharging, its lack of quality controls to ensure the prevention of such overcharging (particularly after overcharging was found in California in 2012), as well as how the continued and widespread overcharging of customers led to falsely inflated financial results and a misleading image of the Company's practices and trustworthiness—and, thus, the artificial inflation of the Company's stock price.

64.     Moreover, the Directors, particularly co-CEOs Mackey and Robb, by virtue of their senior-insider positions at Whole Foods, knew about, or were reckless in failing to know about, the illegal overcharging violations since 2010, the materially false and misleading statements and material omissions in Whole Foods' public SEC filings, and that the stock price did not reflect material information about the Company.  Indeed, upon information and belief, co-CEOs Mackey and Robb were responsible for setting the Company policy that drove store owners to overcharge customers in the first place—a policy that was known to and approved by the Board of Directors as a whole.  At least by 2012, the Directors knew that there had been overcharging in California, and thus that sufficient quality controls to prevent further overcharging did not exist at the Company.

65.     Nonetheless, as Plan fiduciaries, defendants—the Company and the Directors—did nothing to act upon that knowledge to protect the retirement savings of the Plan participants to whom they owed their fiduciary duties.

66.     First, defendants had the power to disclose the truth to the public and correct the artificial inflation, inasmuch as it was primarily the false public disclosures that had artificially inflated the stock price. Defendants could have stopped those misrepresentations from ever happening, or corrected them much earlier than they were ultimately corrected, which would have prevented all or some of the artificial inflation, and lessened the ultimate correction.  Either way, Plan participants' losses would have been mitigated, if not altogether prevented.

67.     Defendants cannot hide their inaction behind the securities laws.  In this situation, ERISA and the securities laws compelled defendants to take exactly the same action—tell the truth and correct the inflated stock price.  No law or duty required defendants to *prevent* the disclosure of the truth—quite the opposite.

68.     Second, defendants, who appointed and/or oversaw the investment options under the Plan as well as any Investment Manager, had the power to prevent Plan participants from buying Whole Foods at inflated prices by closing the Company Stock Fund to new investments, either by issuing new instructions to the Investment Manager or by amending the Plan itself—at least until the stock price was corrected (by disclosure of the truth to the public).

69.     Critically, all of these powers remained available to defendants to exercise whether or not some or all of their fiduciary duties were delegated to others.

70.     Defendants cannot argue that this would cause more harm than good. Simply preventing new purchases would not have constituted insider trading. If Whole Foods or the Directors needed to disclose the fact of the freeze to the public, such a disclosure (a) would not have been prohibited by the securities laws and (b) might actually have encouraged the making of a fulsome disclosure to the public about the systemic overcharging and inflated revenues and earnings.

71.     In sum, defendants, who were the fiduciaries of the Plan, breached their fiduciary obligations to Plan participants. They allowed those to whom they owed the "highest duties under law" to purchase Company stock at an artificially high price during the Class Period, knowing that damaging material information was not factored into the stock price or disclosed to the public. In other words, unbeknownst to them, the Plan participants were "overcharged" for their shares of the Company Stock Fund. No matter what happens to its stock price in the future—even if it recovered all of its losses—the Plan participants would still be injured because they were deprived of retirement money that otherwise would have rightfully been theirs from overpaying for the stock.

72.     And Plan participants who simply held Whole Foods' shares during the Class Period were injured as well, because they were prohibited from being able to invest in an alternative, prudent investment that would not have caused them the same losses during the Class Period.

73.     Millions upon millions of dollars were lost from the retirement accounts of Whole Foods employees. Defendants, as Plan fiduciaries, are directly responsible for this enormous harm that its breaches of duty caused.

## VI. CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this action as a class action pursuant to Federal Rule of Procedure 23(a), (b)(l) and/or (b)(2) on behalf of himself and the following class of persons similarly situated (the "Class"):

>       All individuals, excluding defendants, who participated in the Plan and whose individual accounts purchased and/or held the Whole Foods Stock Fund at any time between January 1, 2010 and July 30, 2015, inclusive.

75.     Excluded from the Class are defendants, other officers and directors of the Company, members of defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

76.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are over 76,000 members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Whole Foods or the Plan and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

77.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

78.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether defendants each owed a fiduciary duty to the Plan, to plaintiff and to members of the Class;

b. Whether defendants breached fiduciary duties owed to the Plan, plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

c. Whether defendants violated ERISA; and

d. The extent to which Class members have sustained damages and the proper measure of those damages.

79. Plaintiff's claims are typical of the claims of the members of the Class because plaintiffs and the other members of the Class each sustained damages or were negatively affected by defendants' wrongful conduct in violation of ERISA as complained of herein.

80. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel highly competent and experienced in class action and complex litigation, including actions involving ERISA plans. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

81. Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because this action is also brought on behalf of the Plan, and any prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to the Plan which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

82. Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for defendants; (ii) defendants

have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

83.    Plaintiff also brings this action on behalf of the Plan pursuant to ERISA §§ 409(a), 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2).

### COUNT I
### Failure to Prudently and Loyally Manage the Plan's Assets
### (Against All Defendants)

84.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

85.    At all relevant times, as alleged above, all defendants were fiduciaries within the meaning of ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

86.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that all investments in the Company's stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

87.    A fiduciary's duty of prudence require it to disregard plan documents or directives that it knows or reasonably should have known would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29

U.S.C. § 1104(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plans, including plan trustees, to do so.

88.     Defendants' duty of prudence also obligated them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that Plan participants need in order to exercise their rights and interests under the Plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investments and investment options such that the Plan participants can make informed decisions with regard to the prudence of investing in such options made under the Plan.

89.     Defendants breached their duties to prudently manage the Plan's assets. During the Class Period, defendants knew that the Whole Foods Company Stock Fund had become an imprudent investment for Plan participants' retirement savings because there was false and misleading material information given to Plan participants and the public about the stock that had artificially inflated its value.

90.     Accordingly, defendants should have taken appropriate responsive action by restricting transactions or new investments by the Plan in the Company Stock Fund or by effectuating disclosures that would have corrected the stock price and rendered the Company Stock Fund a prudent investment again.  Defendants also breached their duties by failing to provide complete and accurate information about Whole Foods' illegal

overcharging, its financial results, its growth, its quality controls, its brand value and its prospects as an appropriate retirement investment.

91.     As such, between January 1, 2010 and July 30, 2015, Plan participants could not appreciate the true risks presented by investments in Whole Foods' stock and, therefore, could not make informed decisions regarding their investments.

92.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and other Plan participants, suffered foreseeable damage to and/or lost a significant portion of their retirement investments.  Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## COUNT II
### Failure to Provide the Plan Fiduciaries with Accurate Information
### (Against All Defendants)

93.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

94.     At all relevant times, as alleged above, defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

95.     At all relevant times, as alleged above, the scope of the fiduciary responsibility of defendants included the responsibility to appoint, evaluate, and monitor other Plan fiduciaries, including, but not limited to, any "Investment Manager" to which certain fiduciary responsibilities were at least partially delegated.

96.     Defendants' fiduciary duty entailed ensuring that these other Plan fiduciaries each had truthful and accurate information to fulfill their respective jobs and

duties as fiduciaries and to properly monitor, evaluate and oversee the Plan's investment in the Company Stock Fund.

97.     Under ERISA, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and its assets.

98.      Defendants breached their fiduciary monitoring duties between January 1, 2014 and July 30, 2015 by failing to provide the public, and therefore their co-fiduciaries and their fiduciary delegates, with truthful and accurate information concerning Whole Foods' illegal overcharging, its financial results, its growth, its quality controls, its brand value and its prospects as an appropriate retirement investment.

99.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and other Plan participants, suffered foreseeable damage to and/or lost a significant portion of their retirement investments.

100.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## VII. PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for:

A.     Determination that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing plaintiff as class representative, and determining that plaintiff's counsel satisfies the prerequisites of Rule 23(g);

B.      Declaration that defendants breached ERISA fiduciary duties owed to the Plan and its participants;

C.      An Order compelling defendants to make good to the Plan all losses to the Plan resulting from defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if defendants had fulfilled their fiduciary obligations;

D.      Imposition a Constructive Trust on any amounts by which defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      An Order enjoining defendants from any further violations of their ERISA fiduciary obligations;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses including the lost opportunity costs;

G.      An Order that defendants allocate the Plan's recovery to the accounts of all participants who had any portion of their account balances invested in the Whole Foods Stock Fund in proportion to the accounts' losses attributable to the decline in the price of its ADRs and/or the value of investment in alternative options under the Plan.

H.      Awarding the Plan and/or Plan participants rescission and/or money damages including pre-judgment interest;

I.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

J.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine;

K.      An Order for equitable restitution and other appropriate equitable monetary relief against defendants; and

L.      Such other and further relief the Court deems just and equitable.

### VIII. DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

By:      /s/ Samuel E. Bonderoff
Samuel E. Bonderoff *
NY Bar No. 4130977
samuel@zamansky.com
Jacob H. Zamansky *
NY Bar No. 181467
jake@zamansky.com
**ZAMANSKY LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177

* Pro hac admission pending

J. Hampton Skelton
State Bar No. 18457700
hskelton@skeltonwoody.com
Brandon D. Gleason
State Bar No.24038679
bgleason@skeltonwoody.com
**SKELTON & WOODY**
248 Addie Roy Road, Suite B-302
Austin, TX 78746
Telephone: (512) 651-7000
Facsimile:  (512) 651-7001

ATTORNEYS FOR PLAINTIFFS