IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| THOMAS MARTONE, and all other individuals similarly situated, | § § § | |
| Plaintiff, | § § | |
| v. | § § | 1:15-CV-877  RP |
| WHOLE FOODS MARKET, INC, et al., | § § § | |
| Defendants. | § | |

### ORDER

Before the Court are Defendants' Motion to Dismiss, filed February 19, 2016, (Dkt. 23), and the responsive pleadings thereto. After the Court's review of the pleadings and the relevant case law, and after a hearing on the motion, the Court issues the following order.

### I. BACKGROUND

Plaintiff Thomas Martone brought this action on October 2, 2015 against Whole Foods Market, Inc. ("Whole Foods" or "the Company") and the members of the Board of Directors, John Elstrott, John P. Mackey, Walter E. Robb, III, Shahid Hassan, Stephanie Kugelman, Jonathan Seiffer, Morris Siegel, Jonathan Sokoloff, Ralph Sorenson, Gabrielle Green-Sulzberger, and William Tindell III (collectively "Defendants"). Plaintiff argues that Defendants breached their fiduciary duties to participants in Whole Food's 401k plan by allowing employees to continue to invest in the company while the company's stock was artificially inflated due to a widespread overpricing scheme. Plaintiff brings this suit on behalf of himself and others similarly situated under Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 US.C. § 1132.

**A. The Plan**

Whole Foods is a retailer of natural and organic groceries, such as produce, flowers, meat, seafood, baked goods, prepared foods, and numerous household products. (Compl. ¶ 2, Dkt. 1.)

1

Plaintiff's complaint alleges that, as a former employee of Whole Foods, he was a participant in the Whole Foods Market Growing Your Future 401(k) Plan ("the Plan"). (*Id.* ¶ 1.) Through the Plan, Plaintiff invested in the Company Stock Fund, which invests solely in Whole Foods' common stock. (*Id.* ¶ 5). The complaint alleges that the Plan "is a defined contribution benefit plan that is sponsored by Whole Foods for eligible employees," who "can defer up to 100% of their compensation into the Plan." (*Id.* ¶ 37). Among the investment options available to employees through the Plan is the Company Stock Fund. (*Id.* ¶ 5). The complaint asserts that each of the Defendants were fiduciaries of the Plan because of the control they had over the Plan's administration. (*Id.* ¶¶ 38–44, 65).

## B. The Alleged Overcharging Scheme

Plaintiff alleges that Whole Foods had a systemic practice of illegally overcharging customers for prepackaged foods. (*Id.* ¶¶ 49, 52). This allegation is primarily based on two investigations by governmental agencies in New York and California. In New York, the New York City Department of Consumer Affairs ("NYDCA"), uncovered that Whole Foods' eight New York City stores were systematically overcharging customers for pre-packaged foods, such as meat, dairy, and baked goods. (*Id.* ¶¶ 46–48.) The NYDCA uncovered "thousands of potential overcharging violations," and at times, the company overcharged customers by more than $6 an item. (*Id.* ¶¶ 47–46). The *Washington Post* later reported that the company had "received more than 800 violations during 107 separate inspections **since 2010**." (*Id.* ¶ 50) (emphasis in complaint). Plaintiff alleges that similar violations were discovered in California in 2012, where an investigation revealed that the company was "overcharging customers due to improper weighting and quality control." (*Id.* ¶ 51).

Plaintiff alleges that during the same time that these overcharging violations were occurring on opposite sides of the country, Whole Foods was experiencing "enormous growth of its sales revenues, net income, new stores and stock price." (*Id.* ¶¶ 51–52). Further, the Plaintiff asserts that the Company made representations to investors emphasizing the importance of offering value to

2

customers and its overall brand reputation. (*Id.* ¶ 55.) The complaint provides an example from the Company's 2013 10-K, which states:

> We remain committed to the highest quality standards and to providing a clear range of choices in every category, both of which we believe are important in driving our sales growth over the long term. In addition to offering our 365 Everyday Value brands, we have competitively matched prices on thousands of known value items, [and] extended value choices to our perishables departments. . . . We seek to be a deeply responsible company in the communities where we do business around the world, providing ethically sourced, high-quality products and transparent information to our customers, reducing our impact on the environment, and actively participating in our local communities.

(*Id.* ¶ 55.) Plaintiff alleges that investors relied on statements like this when making investment decisions because it led them to believe the company "was not only committed to consumer values and corporate responsibility, but that it had the controls and systems to do so." (*Id.* ¶ 56.)

Plaintiff alleges that representations like these were materially false and misleading because they failed to disclose the Company's systemic overpricing problem, leading to misrepresentations about the Company's business prospects and stock that was artificially inflated in value. (*Id.* ¶ 56.) Further, Plaintiff argues that the Company and its board knew (or were reckless in failing to know about) the illegal overcharging violations, the misrepresentations and material omissions in the Company's public filings, and that the Company's stock price was artificially inflated. (*Id.* ¶¶ 62–64.)

### C. The Stock Drop

Plaintiff notes that on January 1, 2010, Whole Foods' stock closed at $13.61 per share. (*Id.* ¶ 54.) After splitting two-for-one in May 2013, the stock peaked at $63 per share in October 2013, and prior to the NYDCA press release publication, the stock was trading above $40 per share. (*Id.* ¶ 54.)

According to Plaintiff's allegations, Whole Foods' overcharging scheme was finally revealed when the NYDCA published a press release explaining its findings on June 24, 2015. (*Id.* ¶ 46.) Plaintiff explains that "Whole Foods' systematic, illegal overcharging of customers became an

enormous national news story," because of this press release, and that it eventually led to the co-CEOs of Whole Foods issuing a video apologizing to customers. (*Id.* ¶ 49.) A few weeks later, Whole Foods released a Form 8-K with the SEC and issued an accompanying press release that showed that the Company's expected earnings were well below expectations. (*Id.* ¶ 59.)

Plaintiff alleges that "when [Whole Foods] finally released financial and operating results that reflected books that were no longer cooked—Whole Foods' artificially inflated stock price returned to earth, falling $4.74 per share, more than 11%, on one day's trading." (*Id.* ¶ 4.)

Thus, Plaintiff argues, "[a]ny Plan participant who purchased shares of the Company Stock Fund during the time when the stock was artificially inflated was buying it at a falsely high price. When the fraud was inevitably revealed, and the stock price returned to a level that actually reflected its value, those purchasers suffered considerable losses and were damaged as a result." (*Id.* ¶ 11).

### D. Alleged Breaches Under ERISA

Based on the alleged overpricing scheme and the stock drop that followed, Plaintiff argues that Whole Foods and its directors breached their fiduciary duty under ERISA. "Congress enacted ERISA to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans and to 'provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). ERISA requires pension plan fiduciaries to act prudently in managing the plan's assets, *Fifth Third Bancopr v. Dudenhoeffer*, 134 S. Ct. 2459, 2463 (2014) (citing 29 U.S.C. § 1104(a)(1)(B)), and "in accordance with the documents and instruments governing the plan," 29 U.S.C. § 1104(a)(1)(D). Fiduciaries who breach these responsibilities are personally liable for any losses to the plan caused by their breach. *Id.* § 1109(a). Plan participants and beneficiaries may bring a civil cause of action to obtain appropriate equitable relief to redress these breaches. *See id.* § 1132(a).

Plaintiff, through his complaint filed October 2, 2015, asserts that Defendants breached their fiduciary duties by failing to provide plan participants and the public with complete and accurate information when they knew that the Company Stock Fund had become an imprudent investment because there was false and misleading information given to plan participants and the public which artificially inflated the Company's stock. (*Id.* ¶¶ 89, 97-98.)

Defendants moved to dismiss Plaintiff's complaint on February 19, 2016. Defendants argue that Plaintiff's complaint should be dismissed for two primary reasons: (1) Plaintiff lacks constitutional standing and (2) Plaintiff fails to adequately plead breach of fiduciary duty. After additional briefing by the parties, and a hearing on June 29, 2016, the Court now considers Defendants arguments.

## II. Constitutional Standing

Defendants allege that Plaintiff lacks constitutional standing to bring this cause of action because he has failed to allege actual injury. (Defs.' Mot. to Dismiss at 16–19, Dkt. 23). To establish constitutional standing, "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The plaintiff has the burden of establishing these elements. *Id.* at 1547; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). At each stage of litigation, the plaintiff must support each element "in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan*, 504 U.S. at 561. "[A]t the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo*, 136 S. Ct. at 1547 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

First, for a plaintiff to demonstrate "injury in fact," it must have suffered a violation of a legally protected interest which is concrete, particularized, and actual or imminent. *Lujan*, 504 U.S. at 560. The Supreme Court recently elaborated on the requirements that an injury be particularized and

5

concrete in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). The Court explained that, "for an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 136 S. Ct. at 1548. For an injury to be concrete, "it must actually exist," or be "'real,' and not 'abstract.'" *Id.* at 1549. The Court made clear that "[t]his does not mean . . . that the risk of real harm cannot satisfy the requirement of concreteness." *Id.* (noting that recovery on certain tort claims is permitted even where the harm is "difficult to prove or measure"). Second, for an injury to be fairly traceable, it must be caused by the challenged action of the defendant, and not the result of the independent action of some third party. *Lujan*, 504 U.S. at 560. Finally, for an injury to be redressable it must be likely—not speculative—that the injury will be redressed by a favorable decision. *Id.* at 561. While Defendants primarily allege that Plaintiff has not adequately alleged injury, the Court will consider whether Plaintiff has sufficiently alleged facts demonstrating each of the elements of Constitutional standing.[1]

**A.     Injury**

The complaint adequately alleges a concrete and particularized injury. It alleges that Plaintiff "purchased and held shares of Whole Foods stock in his Plan retirement savings account" during the time period of January 1, 2010 through July 30, 2015, (Compl. ¶ 23, Dkt. 1), and during that same time the stock price "was artificially inflated in value," (*Id.* ¶ 57). The complaint goes on to allege that in July 2015, in the wake of negative media attention regarding Whole Foods' overcharging for pre-packaged foods, the stock price fell. (*Id.* ¶ 61). Specifically, it fell 11% in one day's trading. (*Id.* ¶ 4). The complaint explains that the plan participants, which include Plaintiff, "were 'overcharged' for their shares" in Whole Foods and thus "were deprived of retirement money that would have rightfully been theirs." (*Id.* ¶ 71). Thus, Plaintiff adequately alleged a concrete injury—the loss in value and retirement money that he incurred from overpaying for Whole Foods

---

[1] This Court has an independent obligation to ensure that is has jurisdiction over cases before it. *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011).

stock when it was artificially inflated and then holding the stock while the price fell after news broke of the company's overcharging practices.[2] Further, this injury is particular to him because he purchased shares while the stock was inflated and held those shares while the stock price dropped.

Defendants rely on *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), to argue that Plaintiff must allege that he sold his shares of Whole Foods at a loss in order to adequately plead injury. (Defs.' Mot. to Dismiss at 17, Dkt. 23; Defs.' Reply at 3, Dkt. 32.) This argument misreads *Dura*.[3] In *Dura*, individuals brought a securities fraud class action based on misrepresentations by Dura Pharmaceuticals. Dura's stock, which plaintiffs alleged was falsely inflated, lost almost half its value when the company announced lower than expected earnings. 544 U.S. at 339. At issue was whether the complaint adequately alleged "economic loss" and "loss causation," two elements of the plaintiffs' securities fraud claim, where the complaint said little about what loss the plaintiffs incurred and how it was caused by the misrepresentations. *Id.* at 339–40.

The Supreme Court observed that the complaint contained "only one statement that . . . can fairly [be] read as describing the loss caused by the defendants' . . . misrepresentations"—a statement that said "that the 'plaintiffs paid artificially inflated prices for Dura['s] securities' and suffered 'damage[s].'" *Id.* at 346–47. The Court held that the allegation was not sufficient to allege economic loss or loss causation. *Id.* at 347. First, the Court explained that purchasing stock at an inflated price, alone, might not cause economic loss because, for example, a purchaser could quickly sell again at an inflated price and avoid loss. *Id.* at 342. Second, it explained that even if the purchaser later sold its shares at a lower price, it does not necessarily mean the loss was caused by the company's

---

[2] Arguably, the loss is not tangible until a sale of stock occurs. Tangibility is not, however, required for standing. *Spokeo*, 136 S.Ct. at 1549 ("Although tangible injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete.").

[3] While the Court disagrees with Defendants' reading of *Dura*, it agrees with Defendants that the logic of *Dura* is relevant to an inquiry into whether injury has occurred, even outside of securities fraud actions. *See, e.g., Brown v. Medtronic, Inc.*, 628 F.3d 451, 456 (8th Cir. 2010) ("The Court in *Dura* did not face a question of ERISA fiduciary duties. Regardless, the Court pronounced a rule that it described as 'pure logic.' . . . Presumably any such rule founded on basic concepts of loss and injury and characterized as 'pure logic' should find broad application in ERISA, securities law, and other contexts where plaintiffs describe their injuries in terms of stock price changes.").

7

misrepresentations, and not other factors.[4] *Id.* at 343. Because the complaint failed to describe "the relevant economic loss" and "the causal connection . . . between that loss and the misrepresentation[s]," the Court concluded that the complaint did not meet the pleading requirements under Federal Rule of Civil Procedure 8(a)(2). *Id.* at 347. Notably, nowhere in *Dura* does the Supreme Court hold that the plaintiffs were required to allege that the stock was "sold at a loss," as Defendants argue. (Defs.' Mot. to Dismiss at 17, Dkt. 23). Instead the Court suggests that it was "[t]he complaint's failure to claim that Dura's share price fell significantly after the truth [regarding the misrepresentations] became known" that was fatal. *Dura*, 544 U.S. at 347.

Here, Plaintiff alleged what the complaint in *Dura* was missing—that "[w]hen the truth [about Defendants' misrepresentations] came out, the stock price fell." (Compl. ¶ 71, Dkt. 1.) Further, because it alleged that "Plaintiff purchased and held shares of Whole Food's stock in his Plan retirement account during the Class Period"—and that the stock price drop occurred at the very end of the Class Period—the complaint makes clear that Plaintiff owned stock that lost value due to Defendants misrepresentations and suffered injury. (*Id.* ¶¶ 23, 59–62.)[5]

**B.      Fairly Traceable**

The complaint alleges that the injury is fairly traceable to the wrongful actions of Defendants. Here, Plaintiff alleges that his injury—the loss in value to his retirement account—was caused by Defendants' breaches of their fiduciary duties. He alleges that Defendants knew (or were reckless in not knowing) of Whole Foods systematic overcharging of prepackaged goods, and knew that it was causing the Company's stock price to be artificially inflated. (*Id.* ¶¶ 62–64.) He alleges that

---

[4] At this part of the discussion in *Dura*, the Supreme Court was addressing what the Plaintiff must *prove*. 544 U.S. at 342–46. The Court made clear that at the pleading stage, the plaintiff need only adequately *allege* causation pursuant to Federal Rule of Civil Procedure 8. *Id.* at 346.

[5] The Court acknowledges that at later stages in this litigation, Plaintiff's allegations regarding injury and causation may need to be more specific to ensure he has meet the constitutional requirements for standing, but as *Dura* explains, there is a difference between what a plaintiff must ultimately prove and what they must initially allege. *Dura*, 544 U.S. at 346–48. The complaint's allegations certainly provide "some indication of the loss and the casual connection" at issue, and are sufficient to meet the constitutional requirements at this stage. *Id.* at 347.

there were two alternative actions that Defendants could have taken to prevent Plaintiff's injury, and that by not taking these actions, they breached their fiduciary duty to the Plan. (Compl. ¶¶ 65–71, Dkt. 1.)

While Plaintiff may face a heavy burden at a later stage to *prove* that the injury he experienced—the loss in value of his retirement plan—was caused by Defendants' alleged breaches, and not some other factor,[6] he has met his burden here to allege plausibly that the breaches of fiduciary duties caused his injury.

C.  **Redressability**

Because the alleged injury in this case is financial, the injury is redressable by an award of monetary damages. *See In re Deepwater Horizon*, 739 F.3d 790, 803 (5th Cir. 2014) (holding that where plaintiffs alleged they had each suffered economic damages, their injury was "susceptible to redress by an award of monetary damages").

### III. Adequacy of Pleadings

In addition to arguing that Plaintiff does not have constitutional standing in this case, Defendants argue that the complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief that can be granted. When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6), "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). Although Federal Rule of Civil Procedure 8 mandates only that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief," this standard demands more than unadorned accusations, "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual

---

[6] *See supra* note 4 & accompanying text.

9

enhancement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. The court must initially identify allegations in the complaint that are no more than legal conclusions or "[t]hreadbare recitals of a cause of action's elements," then assume the veracity of well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 79 (2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Defendant alleges that the complaint fails to adequately allege a breach of fiduciary duty for three primary reasons. First, Defendants argue that the complaint fails to meet the standards outlined by the Supreme Court for pleading in ERISA suits involving an employee stock ownership plan. Second, Defendants argue that only one of the Defendants is a Plan fiduciary. Third, Defendants argue that even if more than one of the Defendants is deemed a fiduciary under the Plan, the Defendants had limited fiduciary duties that did not extend to the breaches alleged in this case. Because the Court finds that Defendants' first argument is dispositive, it will not address the other two.

**A. Whether Plaintiff Has Adequately Pled Under *Fifth Third* Standard**

In *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), the Supreme Court laid out standards for evaluating when a claim under ERISA for breach of fiduciary duty has plausibly been alleged in cases involving an employee stock ownership plan. *Id.* at 2470–71. Where a plaintiff alleges that a fiduciary acted imprudently by failing to act on the basis of nonpublic information the fiduciary had because it was a company insider, the plaintiff must make two plausible allegations. First, the "plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws." *Id.* at 2472. Second, they must allege "that

10

a prudent fiduciary in the same circumstances would not have viewed [that alternative act] as more likely to harm the fund than to help it." *Id.* The Supreme Court explained:

> [L]ower courts faced with such claims should . . . consider whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that stopping purchases—which the market might take as a sign that insider fiduciaries viewed the employer's stock as a bad investment—or publicly disclosing negative information would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund.

*Id.* at 2473.

The Supreme Court later reviewed the Ninth Circuit's application of *Fifth Third* in *Amgen Inc. v. Harris*, 136 S. Ct. 758 (Jan. 15, 2016). In *Amgen*, the Ninth Circuit had reversed the district court's dismissal of a complaint, reasoning that the complaint met the *Fifth Third* standards because "when 'the federal securities laws require disclosure of material information,' it is 'quite plausible' that removing the Amgen Common Stock Fund 'from the list of investment options' would not 'caus[e] undue harm to plan participants.'" The Supreme Court disagreed. *Id.* at 759. It held that the Ninth Circuit "failed to properly evaluate the complaint" by not "assess[ing] whether the complaint . . . 'plausibly alleged' that a prudent fiduciary in the same position 'could not have concluded' that the alternative action 'would do more harm than good.'" *Id.*

Defendants argue that Plaintiff's complaint includes no more than "the generalities rejected in *Amgen*," (Defs.' Reply at 9, Dkt. 32), and ultimately fails to allege that a prudent fiduciary would not have concluded that the alternative actions mentioned in the complaint would have done more harm than good, (Defs.' Mot. to Dismiss at 9, Dkt. 23). Plaintiff counters that his pleadings meet the standards outlined in *Fifth Third*, first because he has adequately pled alternative actions that are both consistent with securities laws, and second because he has alleged that those actions would not have been viewed by a prudent fiduciary as more likely to harm the fund the fund than help it. (Pl.'s Resp. at 13, Dkt. 29.)

After the close of briefing and the hearing in this case, the Fifth Circuit directly addressed the question of what pleadings are sufficient to meet the standard set out in *Fifth Third* and *Amgen*. *Whitley v. B.P., P.L.C.*, No. 15-20282, (W.D. Tex. Sept. 26, 2016). The Fifth Circuit reversed a decision by the Southern District of Texas denying a motion to dismiss in an employee stock ownership plan case where employees alleged that fiduciaries at BP, the multinational oil and gas company, had insider information that "BP stock was overpriced because BP had a greater risk exposure to potential accidents than was known to the market" prior to the Deepwater Horizon explosion. *Id.* at 2, 9. The BP employees argued that the defendants had two available alternatives that met with the *Fifth Third* standard: freezing, limiting, or restricting company stock purchases; and disclosing unfavorable information to the public. *Id.* at 3. The Fifth Circuit concluded, however, that it was not plausible that "that a prudent fiduciary could not have concluded that the alternative[s] would do more harm than good." *Id.* at 8. It explained:

> [I]t does not seem reasonable to say that a prudent fiduciary at that time could not have concluded that (1) disclosure of such information to the public or (2) freezing trades of BP stock—both of which would likely lower the stock price—would do more harm than good. In fact, it seems that a prudent fiduciary could very easily conclude that such actions would do more harm than good.

*Id.* at 9. In light of this recent analysis by the Fifth Circuit, the Court will turn to address whether Plaintiff has met both parts of the *Fifth Third* standard.

**1. Alternative Action Consistent with Securities Laws**

The Court agrees with Plaintiff that he has met the first part of the standard alleged in *Fifth Third* by proposing alternative actions for Defendants that would have been consistent with securities laws. Plaintiff alleged that Defendants breached their fiduciary duties by systemically overcharging customers by routinely overstating the weight of pre-packaged items, while deliberately hiding these quality control problems from the public by making misleading representations to investors in securities disclosures. Plaintiff outlines two alternative actions that Defendants could

12

have taken. (Compl.¶¶ 66–70, Dkt. 1.) First, Plaintiff suggests that Defendants could have disclosed the truth regarding the alleged overcharging scheme to the public or refrained from making the misleading representations to investors in the first place. (*Id.* ¶ 66.) Plaintiff asserts that this alternative action would not only have been consistent with law, but that securities laws "compelled [D]efendants to take exactly the same action." (*Id.* ¶ 67.) Second, Plaintiff argues that Defendants could have "prevented[ed] Plan participants from buying While Foods [stock] at inflated prices by closing [the Fund] to new investments." (*Id.* ¶ 68.) Again, Plaintiff notes that this action "would not have been prohibited by the securities laws." (*Id.* ¶ 71.) Notably, while Defendants assert that they had no duty to take either of these actions, they do not contest that they are lawful. Thus, Plaintiff has "plausibly allege[d] an alternative action that the [D]efendant[s] could have taken that would have been consistent with the securities laws," pursuant to the requirements of *Fifth Third*. *See* 134 S. Ct. at 2472.

### 2. Prudent Fiduciary Could Not Have Concluded Alternative Action Would Have Done More Harm Than Good

Applying the logic used by the Fifth Circuit in *Whitley v. B.P.*, No. 15-20282 (5th Cir. Sept. 26, 2016), the Court agrees with Defendants that Plaintiff has failed to plausibly allege an alternative action that "a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." *Fifth Third*, 134 S. Ct. 2472. In *Whitley*, the Fifth Circuit explained that the complaint included "conclusory statements" that the alternatives proposed "would not have been more likely to harm the BP Stock Fund." *Whitley*, No. 15-20282, slip op. at 8. Similarly here, Plaintiff's complaint asserts that "Defendants cannot excuse their failure to tell the truth," or disclose the alleged overpricing scheme, "by claiming that, at the time, they could have reasonably thought it would have done more harm than good to do so." (Compl. ¶ 16, Dkt. 1.) Later in the complaint, Plaintiff explains that, with respect to amending the Plan, "Defendants cannot argue that this would have caused more harm than good." (*Id.* ¶ 70.) But like in *Whitley*, the Plaintiff "do[es] not

13

specifically allege, for each proposed alternative, that a *prudent fiduciary* could not have concluded that the alternative would do more harm than good, nor do[es] he offer facts that would support such an allegation." *Whitley*, No. 15-20282, slip op. at 8 (emphasis in original).

Most problematic for Plaintiff's argument, however, is the Fifth Circuit's conclusion that where both alternatives proposed would make the stock price drop "a prudent fiduciary could very easily conclude that such actions would do more harm than good." *Id.* at 9. Like the plaintiffs in *Whitley*, who argued that fiduciaries at BP had insider information about the substantial risk exposure BP had to accidents, Plaintiff here argues that Defendants had insider information about Whole Foods' lack of quality controls in prepackaged food pricing. And Plaintiff here proposes the same two actions as the plaintiffs did in *Whitley*—freezing investment in the company stock by employees, or disclosing the insider information to correct the overpricing. Further, Plaintiff here acknowledges that the two actions he proposes are "likely to have a negative impact on a company's stock price," but argues that the "negative impact w[ould] only get worse the longer the fraud goes on." (Compl. ¶ 16, Dkt. 1; *see also* Compl. ¶ 66, Dkt. 1.) Thus, Plaintiff argues, Defendants could not "have reasonably thought it would have done more harm than good" to not take one of the two alternative actions Plaintiff proposes. (Compl. ¶ 16, Dkt. 1.)

But the Fifth Circuit reached the opposite conclusion. It concluded that in light of the negative impact that either of Plaintiff's proposed actions would have—a lower stock price—"a prudent fiduciary could very easily conclude that such actions would do more harm than good." *Whitley*, No. 15-20282, slip op. at 9. There are no specific facts alleged by Plaintiff in this case that indicate that the same conclusion is inapplicable here. Accordingly, the Court finds that Plaintiff has not plausibly alleged an alternative action that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it.

## IV. CONCLUSION

Based on the foregoing, the Defendants' Motion to Dismiss (Dkt. 23) is **GRANTED**.

Plaintiff's claims against Defendants are **DISMISSED** without prejudice.

**SIGNED** on September 28, 2016.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE