IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| THOMAS MARTONE, and all other individuals similarly situated, | § § § | |
| Plaintiff, | § § | |
| v. | § § | 1:15-CV-877 RP |
| WALTER E. ROBB, III, et al., | § § § | |
| Defendants. | § § | |

**ORDER**

Before the Court is Defendants' Motion to Dismiss Plaintiff's Amended Class Action Complaint, (Dkt. 44), Plaintiff's response, and Defendants' reply. After a review of these filings, the record in this case, and the relevant case law, the Court grants Defendants' Motion.

**I. BACKGROUND**

This is the second time Plaintiff Thomas Martone's claims, alleging violations of the Employee Retirement Income Security Act ("ERISA"), and a corresponding motion to dismiss have come before the Court. Previously, the Court granted Defendant's motion to dismiss without prejudice. (Dkt. 38).

Plaintiff is a former employee of Whole Foods Market, Inc. ("Whole Foods" or "the Company") and a participant in the Whole Foods 401k plan ("the Plan"). In his first complaint, filed on October 2, 2015, Plaintiff alleged that Whole Foods and members of its board of directors breached their fiduciary duties under Section 502 of ERISA to participants in Whole Food's 401k plan by allowing employees to continue to invest in the Company Stock Fund ("the Fund") while the Company's stock was artificially inflated due to a widespread overpricing scheme that the defendants knew or should have known about. Plaintiff's allegations regarding the overpricing scheme were based on two investigations by governmental agencies in New York and California that

1

allegedly uncovered a systemic practice of illegally overcharging customers for prepackaged foods. Plaintiff alleged that when the public finally learned about the overpricing scheme—after being falsely misled by the Company that there were systems and controls in place to prevent such schemes—the stock price dropped eleven percent on one day's trading.

The defendants, Whole Foods and the members of its board, filed a motion to dismiss the original complaint, making two primary arguments. First, they argued that Plaintiff lacked standing under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), because Plaintiff had failed to allege that he sold any of the at issue stock at a loss. Second, they argued that Plaintiff failed to adequately plead breach of fiduciary duty under Federal Rule of Civil Procedure 12(b)(6) because he failed to make allegations sufficient under the standard outlined in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), because only one of the defendants was a fiduciary, and because, even if all of the defendants were fiduciaries, their limited fiduciary duties would not extend to the breaches alleged in this case.

In its prior order, the Court disagreed with the defendants' argument on standing, noting that Plaintiff had alleged that he and others in the proposed class bought into the Fund at an inflated price and held their investments while the price dropped, but agreed with the defendant's argument that the Plaintiff had failed to make allegations sufficient to meet the requirements of *Fifth Third*.[1] In *Fifth Third*, the Supreme Court laid out standards for evaluating when a claim under ERISA for breach of fiduciary duty has plausibly been alleged in cases involving an employee stock ownership plan. *Id.* at 2470–71. It explained that where a plaintiff alleges that a fiduciary acted imprudently by failing to act on the basis of nonpublic information the fiduciary had because he or she was a company insider, the plaintiff must make two plausible allegations. *Id.* at 2472. First, the "plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been

---

[1] Because the Court concluded that this issue was dispositive, it did not reach the defendants' additional arguments.

2

consistent with the securities laws." *Id.* Second, they must allege "that a prudent fiduciary in the same circumstances would not have viewed [that alternative act] as more likely to harm the fund than to help it." *Id.* This Court concluded that Plaintiff had not met this second requirement, relying in large part on the Fifth Circuit's decision in *Whitley v. BP, P.L.C.*, 838 F.3d 523 (5th Cir. 2016). In *Whitley*, the Fifth Circuit considered the same two alternative actions alleged initially by Plaintiff in this case—disclosure of the non-public information and freezing of trades of the company stock—and concluded that, because both "would likely lower the stock price . . . a prudent fiduciary could very easily conclude that such actions *would* do more harm than good." *Id.* at 529 (emphasis in original). This Court concluded that Plaintiff had failed to allege any specific facts that would suggest a prudent fiduciary could reach a different conclusion than the Fifth Circuit concluded a prudent fiduciary could in *Whitley*. The Court therefore granted the defendant's motion to dismiss without prejudice.

Plaintiff filed an amended complaint on October 14, 2016. This complaint varies in a few important respects from the one previously filed by Plaintiff. First, Plaintiff names only three members of Whole Foods' board—Walter E. Robb, III, Glenda Jane Flanagan, and Roberta Lang—as Defendants; the Company itself and the other members of the board have been dismissed. (Am. Compl., Dkt. 41, at 1). Second, Plaintiff alleges that the Class was a net buyer of the Company's stock during the time in which he alleges it was artificially inflated, noting specifically that "there were over $34 million more purchases than sales during the Class Period" by the Fund. (Am. Compl., Dkt. 41, ¶ 84). Third, Plaintiff cites repeatedly to investment research supporting his argument that Defendants "should have . . . concluded that more harm than good to the Plan could not possibly be done by continuing to let the artificial inflation [caused by the alleged overpricing scheme] go uncorrected." (Am. Compl., Dkt. 41, ¶ 84). For example, he alleges:

> Economists and finance experts have conducted numerous empirical studies on the matter, and concluded "the reputational penalty" a company suffers because it

3

> perpetrates a prolonged fraud is significantly greater than any regulatory fines or other penalties that it may incur—in fact, the reputational penalty is "7.5 times the sum of all penalties imposed through the legal and regulatory system." Moreover, "[f]or each dollar that a firm misleadingly inflates its market value, on average, it loses this dollar when its misconduct is revealed, plus an additional $3.08 . … [of which] $2.71 is due to lost reputation." And this reputational damage, unsurprisingly, increases the longer the fraud goes one.

(Am. Compl., Dkt. 41, ¶ 87 (internal citations and emphasis omitted)). He also emphasized that "[a]s experienced senior executives, Defendants were—or should have been—familiar with the rudimentary principles of how securities trade in efficient markets." (Am. Compl., Dkt. 41, ¶ 4). Fourth, Plaintiff alleges that a third alternative action available to Defendants existed—directing a portion of the Fund into a low-cost hedging product. (Am. Compl., Dkt. 41, ¶ 107–10).

Defendants filed a motion to dismiss on November 14, 2016. In that motion, they argue that Plaintiff's amended complaint includes no new factual allegations that render the previously proposed—and rejected—alternative actions ones that "a prudent fiduciary could not conclude . . . would be more likely to harm the fund than to help it." (Mot. Dismiss, Dkt. 44, at 18 (quoting *Whitley*, 838 F.3d at 529)). Further, Defendants argue that the new alternative action Plaintiff proposes, investment in a hedging product, would be no better because, absent public disclosure, it could be a violation of securities law and, particularly in light of public disclosure, a prudent fiduciary could easily conclude that investment in such a hedging product would be more likely to harm the Fund than help it.

## II. STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). However,

4

"the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* (citing *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In deciding a motion to dismiss, the court must "construe the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in the plaintiff's favor." *Severance v. Patterson*, 566 F.3d 490, 501 (5th Cir. 2009). The inquiry "focuses on the entirety of the complaint, regardless of how much of it is discussed in the motion to dismiss." *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012). "The court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

### III. DISCUSSION

With respect to the two alternative actions the Court addressed in its prior order—disclosure of the non-public information and freezing of trades of the company stock on in this case—the Court concludes that Plaintiff's amended pleadings cannot overcome Defendants' motion to dismiss. Plaintiff's new allegations regarding the additional reputational damage caused by a company's failure to quickly disclose fraudulent conduct and Defendants' knowledge of basic economic principles do not change the likely outcome of the two proposed actions: a lowered stock price. Plaintiff acknowledges that the actions would lower the Company's stock price, but argues that a lowered price is an insufficient basis for a prudent fiduciary to conclude the action would do

5

more harm than good because the alternative—doing nothing—will inevitably cause an even greater decline in the stock price when the fraudulent conduct is eventually exposed, (Am. Compl., Dkt. 41, ¶¶ 91–93), particularly where the Plan is a net purchaser during the alleged fraud, (Am. Compl., Dkt. 41, ¶ 92). Plaintiff argues that his allegations that the disclosure of the alleged fraudulent conduct is inevitable and that the Plan as a net purchaser sufficiently distinguishes this cases from *Whitley*.

The Court disagrees. First, Plaintiff expressly alleges that "in virtually every fraud case," the truth will eventually come out, and that the later the disclosure is made, the greater the harm to stock holders will be. (Am. Compl., Dkt. 41, ¶ 91). Because of its generalized nature, this allegation is not the sort of specific factual allegation that can distinguish this case, but an alleged economic reality. To the extent it is true here, it was similarly true in *Whitley*, yet the Fifth Circuit in that case nevertheless found that a prudent fiduciary could easily conclude that taking an action that might expose fraudulent conduct might do more harm than good. *Whitley*, 838 F.3d at 529; *see also In re JPMorgan Chase & Co. Erisa Litig.*, No. 12 CIV. 04027, 2016 WL 110521, at *4 (S.D.N.Y. Jan. 8, 2016) (rejecting "assertion[]" that the longer a fraud continues, the more severe a corrective stock drop will be because it was "not particular to the facts of th[e] case and could be made by plaintiffs in any case asserting a breach of ERISA's duty of prudence"). The Court finds that Fifth Circuit's conclusion in *Whitley* thus precludes reaching a different outcome based on the assertion at issue—that it is always better to disclose a fraud sooner rather than later because all frauds eventually come out—or the allegation that Defendants knew it.

Second, regarding Plaintiff's allegation that the Plan was a net purchaser of the Company's stock during the Class Period, the Court concludes that while this allegation is the sort of specific factual allegation necessary to support a proposed alternative action, it still falls short of meeting Plaintiff's burden. Here, Plaintiff alleges that because the Fund was a net purchaser of Whole Foods' stock during the Class Period, meaning that it lost more money due to the over-inflated stock value

6

than it gained, a reasonable fiduciary could not have concluded that disclosing the fraudulent conduct would do more harm than good. Plaintiff's suggestion is that if plan participants were making money on the over-inflated stock by selling more stock than they were buying, a prudent fiduciary could expect that taking an action that might lower the price would do harm than good. Conversely, if plan participants were, on average, purchasing Company stock, as Plaintiff alleges they were, a prudent fiduciary could not have concluded that disclosure would have caused more harm than good.

There are two main flaws with this argument. First, as the Plaintiffs themselves seem to acknowledge, anytime a fraud is disclosed to the market, there is a possibility that the market over-corrects. As the Fifth Circuit held in *Whitley* "[u]nder the Supreme Court's formulation, the plaintiff bears the significant burden of proposing an alternative course of action so clearly beneficial that a prudent fiduciary could not conclude that it would be more likely to harm the fund than to help it." *Whitley*, 838 F.3d at 529. In light of *Whitley*, it would be difficult to conclude that any alternative action that indisputably lowers the company's stock price—possibly even more than warranted—would be "so clearly beneficial." *Id.* Second, Plaintiff's allegation has the benefit of hindsight. Any of Defendants, at the beginning of the Class Period, could not be expected to know that the Fund would be a net purchaser or a net seller during the Class Period. Plaintiff is thus arguing that a prudent fiduciary should have correctly predicted the future and then acted on it—an argument the Court cannot accept.

Having concluded that, as amended, the two proposed alternative actions Plaintiff included in his prior complaint are still insufficient to overcome Defendants' motion to dismiss, the Court turns to apply the *Fifth Third* standard to Plaintiff's new proposed alternative action—directing a portion of the company's stock fund into a low-cost hedging product. Although the Plaintiff does not name a specific hedging product, the amended complaint does roughly outline the product. The

7

product envisioned by the amended complaint directs one to two percent of "annual cash deposits" from the Fund into an irrevocable trust to be pooled "together from a group of financially healthy and diverse companies for a fixed period of time." (Am. Compl., Dkt. 41, ¶¶ 107–108). The trust is managed by a third party, who typically invests the pooled funds into low-risk options, like U.S. Treasury securities. (*Id.* ¶ 108). Then, at the conclusion of the fixed period, if any of the companies experience a decline in stock value, the trust restores the lost value. (*Id.*). If there is no loss, the trust may pay out to other companies who lost value, or, if no company invested in the trust lost value, then the Fund may receive a refund of some of its investment. (*Id.* ¶ 109). At this stage, the Court accepts as true Plaintiff's assertion that such a product exists as described in the amended complaint and that it was an available investment for the Fund—meaning there was a seller who would have sold the Fund the product as described.

Defendants argue that this proposed action would have failed both steps of the *Fifth Third* test. First, Defendants argue that investing a portion of the fund in a hedging product like the one described in the amended complaint would require disclosure of the investment, which, like the other alternative actions already addressed by the Court in its prior order, a reasonable fiduciary could conclude would cause more harm than good because it would likely cause the Company's stock value to drop. Second, Defendants argue that the absence of disclosure would mean that Defendants would be trading on inside information and making material omissions to investors in violation of securities laws. While Plaintiff acknowledges that to purchase the low-cost hedging product described, Defendants would have had to "utilize[] their power as members of the Investment Committee to issue new investment guidelines," he argues that because the hedging

product is not a derivative, its "purchase need not be disclosed under federal securities laws."[2] (*Id.* ¶ 107).

The Court concludes, however, that the only reasonable inference from Plaintiff's factual allegations regarding the hedging product is that a prudent fiduciary could reasonably conclude that investing in such a product would do more harm than good, either because it would lead to disclosure of the reason for the hedge—the alleged overpricing scheme—or, at the least, public knowledge that the Company faced a substantial risk, and in either case risk a stock price drop in the future.

First, Defendants argue that based on the information provided by Plaintiff regarding the proposed hedging product, plan participants would have to be informed about the purchase of the hedge. Defendants point to ERISA § 404, the Investment Committee Charter, and the Administrative Committee Charter to argue that to execute the purchase of a hedging product by Fund participants, a notice of the change in investment options would need to be given to plan participants. (Defs.' Mot. to Dismiss, Dkt. 44, at 20; *see, e.g.*, 29 U.S.C. § 1104(c); Investment Committee Charter, Dkt. 44 Ex. E, ¶ IV(B)(7) ("The Investment Committee is responsible for giving the Administrative Committee advance notice of all changes in available investment alternatives."); Administrative Committee Charter, Dkt. 44 Ex. F, ¶ IV(D)(2)(a)(i) ("The Administrative Committee is responsible for ensuring that investment information is disclosed to the participants and beneficiaries in a manner that satisfies the requirements of ERISA § 404(c)(l).").

Plaintiff responds that "nothing . . . suggests that a specific or detailed disclosure regarding the hedging product would be necessary," and questions whether the purchase of a hedging product would require any disclosure at all. (Pl.'s Resp., Dkt. 45, at 16). In support of this position, Plaintiff

---

[2] Plaintiff's assertion that investment in the hedging product it describes without disclosure is not a violation of federal securities laws is a legal conclusion and need not be accepted by the Court. *See Iqbal*, 556 U.S. at 678.

9

directs the Court to a regulation governing the implementation of ERISA § 404, to a part that describes the annual plan-related disclosures required under § 404(c), arguing that "none of these items refers to anything like the hedging product described in the amended complaint." (*Id.* at 17). However, one of the required disclosure items in this regulation is "an identification of any designated investment alternatives offered under the plan." 29 C.F.R. § 2550.404a-5(c)(1)(i). Plaintiff fails to address why the hedging product would not constitute a "designated investment alternative under the Plan." Regardless, Plaintiff's focus on this regulation—regarding annual disclosures— appears misplaced. The statute itself, ERISA § 404(c), requires that notice be given to plan participants following a "qualified change in investment options." *See* 29 U.S.C. § 1104(c)(4)(C)(i). "[T]he term 'qualified change in investment options' means . . . a change in the investment options . . . under which--(i) the account of the participant or beneficiary is reallocated among one or more remaining or new investment options which are offered in lieu of one or more investment options offered immediately prior to the effective date of the change . . . ." 29 U.S.C. § 1104(c)(4)(B)(i).

Plaintiff wholly fails to address why a reallocation of the Fund from an investment solely in the company's stock to an investment including both the company's stock and the hedging product described in the amended complaint would not qualify as a "qualified change in investment options." The hedging product appears to be an investment option, rather than a fee, and Plaintiff identifies no de minimis exception for very small changes to investment options that absolves fiduciaries from the notice requirements in ERISA § 404(c). Assuming this notice requirement did apply to the hedging product, "written notice of the change" would be sent to plan participants, "including information comparing the existing and new investment options," 29 U.S.C. § 1104(c)(4)(C), such as identifying information, performance data, fee and expense information, and a website where a plan participant could get more information regarding the product—including its

"goals" and "strategies," *see* 29 C.F.R. § 2550.404a-5(d). This notice would likely be sufficient to alert plan participants that the Investment Committee was seeking to pair employee's investment in the company with a hedge against a drop in the Company's stock, which would likely raise concerns in the broader market regarding the health of the Company or hasten the ultimate disclosure of the alleged pricing scheme and lead to a drop in the Company's stock price that a reasonable fiduciary could conclude would do more harm than good.

Given remaining and unaddressed questions regarding exactly how Defendants would purchase the hedging product described by Plaintiff in the amended complaint in compliance with ERISA, however, the Court is hesitant to determine that such a notice would be required as a matter of law. But the Court need not make that determination. Based on the Court's own analysis of ERISA and Plan documents, the Court concludes that the only reasonable inference it can make is that a prudent fiduciary could conclude that taking Plaintiff's proposed alternative action— purchasing a low-cost hedging product out of the fund—would require some sort of disclosure to Plan participants and risk causing a stock drop.

Plaintiff seems to suggest that the remaining uncertainty requires the Court to deny Defendants' motion to dismiss and allow any necessary details to be fleshed out later. In reality, however, where the only reasonable inference this Court can make based on the information provided by Plaintiff about the purchase of a low-cost hedging product is that it would require notice to Plan participants under ERISA, Plaintiff has failed to carry his burden of showing a plausible alternative course of action, and the Court must grant Defendant's motion. In other words, while it is conceivable to the Court that there may be some way for Defendants to have purchased a product like the one described in Plaintiff's amended complaint without sending a notice to plan participants, based on the information the Court has about the proposed hedge from the amended complaint, it is simply not plausible. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("Because

the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."). The Court therefore concludes that Plaintiff has failed to state a claim meeting the requirements outlined in *Fifth Third*. Because the Court reaches this conclusion, it does not reach Defendants alternative argument, that the purchase of such a hedge without disclosure would be a violation of securities laws.

Finally, the Court will address Plaintiff's request for leave to amend his complaint. Federal Rule of Civil Procedure 15(a)(2) permits leave to amend "when justice so requires." The Rule "evinces a bias in favor of granting leave to amend." *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597 (5th Cir. 1981); *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 566 (5th Cir. 2002). However, leave to amend "is by no means automatic." *Davis v. United States*, 961 F.2d 53, 57 (5th Cir. 1991). A district court may deny leave to amend if it has a "substantial reason" to do so. *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002). Futility of amendment is a substantial reason. *See Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 872–73 (5th Cir. 2000).

First, the Court concludes that, while additional details regarding Plaintiff's new proposed alternative might be helpful in better understanding whether the purchase of a low-cost hedging product could be made without disclosure and in compliance with securities laws and ERISA, the Court feels confident that no additional detail could demonstrate that the "alternative course of action [was] so clearly beneficial that a prudent fiduciary could not conclude that it would be more likely to harm the fund than to help it." *Whitley*, 838 F.3d at 529. If the risk Defendants perceived from the alleged overpricing scheme was small, a hedge like the one Plaintiff describes might have appeared a waste of Fund investments; if the risk appeared large Defendants may have been concerned about the hedge later eliciting suit from non-employee investors who felt duped (even if Defendants were permitted to not disclose the hedge under federal securities laws). Any possible amendment to Plaintiff's new proposed alternative action therefore appears futile.

12

Second, the Court concludes that amending the complaint to bolster Plaintiff's argument that a fraud occurred would also be futile. Although Defendants repeatedly suggest that because the plaintiff has not successfully alleged that a fraud occurred in a related case, *Markman v. Whole Foods Market Inc., et. al.*, 1:15-cv-681-LY (W.D. Tex. Aug. 19. 2016), the Court cannot conclude that Plaintiff, making similar allegations, has plausibly alleged an alternative action that no reasonable fiduciary would conclude does more harm than good. But importantly, even if the plaintiffs in *Markman* had successfully alleged securities fraud (or do successfully allege it—as the motion to dismiss their amended complaint remains pending), it would be of no help to Plaintiff here. Several courts have held or suggested that even where a plaintiff has plausibly alleged facts consistent with securities fraud, the failure to disclose or correct the fraud as soon as it became known to the defendants was not a breach of the defendants' fiduciary duty under ERISA because a reasonable fiduciary could have concluded that the disclosure would have done more harm than good by making the stock value drop. *See, e.g.*, *Graham v. Fearon*, No. 1:16-cv-2366, 2017 BL 94517 (N.D. Ohio, Mar. 24, 2017) ("Even if Defendants were aware of fraudulent activity that inflated the value of [the company's] stock, Plaintiffs have failed to plausibly allege that they could not have concluded that the corrective disclosure would have done more harm than good."); *Saumer v. Cliffs Nat. Res. Inc.*, 853 F.3d 855, 865 n.2 (6th Cir. 2017) (acknowledging "that the district court denied a motion to dismiss in a related securities fraud claim," and noting that "alleged securities law violations do not necessarily trigger a valid ERISA claim"). Based on the existing case law, this Court would reach the same conclusion. The Court therefore concludes that further amendment to Plaintiff's complaint is futile, and denies leave to amend.

## IV. CONCLUSION

Based on the foregoing, the Defendants' Motion to Dismiss (Dkt. 44) is **GRANTED**. Plaintiff's claims against Defendants are **DISMISSED**.

**SIGNED** on August 2, 2017.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE