# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

No. 17-50702

_____

D.C. Docket No. 1:15-CV-877

United States Court of Appeals
Fifth Circuit

**FILED**
September 4, 2018

Lyle W. Cayce
Clerk

THOMAS MARTONE,

      Plaintiff - Appellant

v.

WALTER E. ROBB, III; ROBERTA LANG; GLENDA JANE FLANAGAN,

      Defendants - Appellees

Appeal from the United States District Court for the
Western District of Texas

Before HIGGINBOTHAM, SMITH, and CLEMENT, Circuit Judges.

### J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is affirmed.

IT IS FURTHER ORDERED that each party bear its own costs on appeal.

**Certified as a true copy and issued
as the mandate on Sep 26, 2018**

**Attest:**

_Lyle W. Cayce_

**Clerk, U.S. Court of Appeals, Fifth Circuit**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-50702

United States Court of Appeals
Fifth Circuit

**FILED**

September 4, 2018

Lyle W. Cayce
Clerk

THOMAS MARTONE,

      Plaintiff - Appellant

v.

WALTER E. ROBB, III; ROBERTA LANG; GLENDA JANE FLANAGAN,

      Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, SMITH, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Thomas Martone, a former Whole Foods employee, brought an action against certain Whole Foods executives who are named fiduciaries for the company's 401(k) plan. Martone alleges that these executives breached their fiduciary duties by allowing employees to continue to invest in Whole Foods stock while its value was artificially inflated due to a widespread overpricing scheme. The district court dismissed the claims, finding that Martone failed to plausibly allege an alternative action that the fiduciaries could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it. We affirm.

No. 17-50702

I.

Whole Foods Market, Inc., offers its employees a defined contribution benefit plan called the Growing Your Future 401(k) Plan. The Plan provides multiple investment options, including the Company Stock Fund, which is an employee stock ownership plan.[1] Thomas Martone is a former Whole Foods employee and Plan participant, and brings this suit against the three members of Whole Foods' Board and Investment Committee who are designated by the Investment Committee Charter as Plan fiduciaries.[2]

Martone alleges that Defendants "breached their fiduciary duties to the Plan and its participants when they knew (or should have known) . . . that Whole Foods' stock price had become artificially inflated due to undisclosed misrepresentation and fraud, yet they took no action whatsoever to protect the Plan or Plan participants from foreseeable resulting harm." Specifically, Martone claims that during the Class Period from January 1, 2010 through July 30, 2015, Whole Foods engaged in "systemic, illegal overcharging of its customers" by "regularly misstat[ing] the weight of pre-packaged food on which prices were based."[3] He further alleged that the company had "insufficient and flawed quality control systems in place to prevent this fraud."

These allegations stem from multiple investigations by government agencies in California and New York. According to Martone's Amended

---

[1] An ESOP is "a type of pension plan that invests primarily in the stock of the company that employs the plan participants." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2463 (2014).

[2] Defendants-Appellees include the company's co-CEO Walter E. Robb, III; its Chief Financial Officer, Glenda Jane Flanagan; and its General Counsel, Roberta Lang.

[3] The Defendants dedicate a substantial portion of their brief to challenging the evidence underpinning Martone's allegations of systemic fraud. Because this appeal comes at the motion to dismiss stage, these factual arguments are largely premature. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly given rise to an entitlement to relief.").

2

No. 17-50702

Complaint, City Attorneys for Los Angeles, Santa Monica, and San Diego filed a complaint against Whole Foods in June 2014, alleging that it had violated California law by "selling packaged items that contained less than the amount stated on the packaging, failing to deduct the tare weight when selling pre-packaged items, and selling items by unit when California law required them to be sold by weight." A week later, Whole Foods allegedly entered into the "California Stipulation" and agreed to pay $800,000 and comply with a permanent injunction prohibiting the company from engaging in certain practices involving products sold by weight. Then, in August 2014 and January 2015, Whole Foods was allegedly caught overcharging customers in Albany, New York; Martone claims that these Albany violations "result[ed] in thousands of dollars of fines." Finally, in June 2015, the New York City Department of Consumer Affairs ("NYCDA") announced it had uncovered that Whole Foods' eight New York City locations were systematically overcharging customers by "routinely overstat[ing] the weights of its pre-packaged products." Martone further contends that it later "became clear that Whole Foods's illegal overcharging was systemic and widespread, and not limited to simply New York City." He cites a *Washington Post* article reporting that Whole Foods stores received "more than 800 violations during 107 separate inspections" between 2010 and 2015.

Martone alleges that throughout this period, Whole Foods was "report[ing] enormous growth of its sales revenues, net income, new stores and stock price." He also notes that during this time, Whole Foods made various representations about its integrity and reputation, which he claims "led investors to believe that the Company was not only committed to consumer values and corporate responsibility, but that it had the controls and systems to do so and the corporate culture among its employees that would prevent it from hiding quality control problems from the public."

3

No. 17-50702

On July 2, 2015, Whole Foods' co-CEOs Walter Robb and John Mackey released a video apologizing to customers for "any discrepancies that may have occurred" and discussing steps that the company would take to ensure future pricing accuracy. On July 29, 2015, Whole Foods filed a Form 8-K announcing its financial and operating results for 2015, which fell below expectations. In an earnings call, Robb acknowledged that the NYDCA press release and attendant media coverage "ha[d] [a] significant impact on [the company's] sales" that was "felt across the whole country."

Martone alleges that "[a]s a result of these disclosures, Whole Foods stock price declined" significantly. Martone claims that on January 1, 2010, Whole Foods stock closed at $13.61 per share. After splitting two-for-one in May 2013, it peaked at $63 per share in October 2013. Before the NYDCA press release issued, the stock was trading above $40 per share. After Whole Foods filed its Form 8-K, the company's stock price declined over 11% to close at $36.08 per share on July 30, 2015.

On October 2, 2015, Martone filed his original Complaint. The district court dismissed the claims without prejudice, and on October 14, 2016, Martone filed the Amended Complaint at issue in this appeal. On August 2, 2017, the district court again dismissed the claims, finding that Martone failed to state a claim that met the requirements outlined by the Supreme Court in *Fifth Third Bancorp v. Dudenhoeffer*.[4] Martone timely appealed.

## II.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[5] "A claim has facial plausibility when the plaintiff pleads factual

---

[4] *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2465 (2014)
[5] *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[6]

We review a district court's grant or denial of a Rule 12(b)(6) motion to dismiss de novo, "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff[.]"[7] However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."[8]

## III.

As a threshold matter, Defendants challenge Martone's standing to bring this action. To have standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[9] "Where . . . a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element."[10] Defendants focus on the first element: injury-in-fact. They contend that Martone lacks standing because he did not allege that he sold his stock at a loss and "[w]hen a plaintiff alleges that a company's stock has been over inflated, simply holding the stock during the class period is insufficient to establish a loss." Specifically, Defendants contend that a plaintiff must have bought the stock at the inflated price *and* sold it at a loss in order to have standing.

Defendants raised this issue in their first motion to dismiss. The district court found that Martone alleged a concrete and particularized injury, namely

---

[6] *Id*. (citing *Twombly*, 550 U.S. at 556).

[7] *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009) (quoting *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007)) (internal quotation marks omitted).

[8] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

[9] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

[10] *Id*. (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

## No. 17-50702

"the loss in value and retirement money that he incurred from overpaying for Whole Foods stock when it was artificially inflated and then holding the stock while the price fell after news broke of the company's overcharging practices."

We agree with the district court. Defendants' argument overreads *Dura Pharmaceuticals v. Broudo*, where the Supreme Court held that a "private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss."[11] Pleading "loss causation" requires more than merely alleging an inflated purchase price.[12] This is so because "at the moment the transaction takes place, the plaintiff has suffered no loss"; he simply owns a stock that still retains its inflated value.[13] If the purchaser were to sell immediately, while the stock is still inflated, there would be no loss. A loss only occurs when the market corrects and the stock's value declines.[14] Contrary to Defendants' suggestion, the Supreme Court did not establish a further requirement that the purchaser sell the stock to prove loss causation.[15] The

---

[11] *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 338–39 (2005). While *Dura* involved securities fraud rather than ERISA fiduciary duties, its logic still applies. *See, e.g.*, *Brown v. Medtronic, Inc.*, 628 F.3d 451, 456 (8th Cir. 2010) ("The Court in *Dura* did not face a question of ERISA fiduciary duties. Regardless, the Court pronounced a rule that it described as 'pure logic.' Presumably any such rule founded on basic concepts of loss and injury and characterized as 'pure logic' should find broad application in ERISA, securities law, and other contexts where plaintiffs describe their injuries in terms of stock price changes.") (internal citations omitted).

[12] In *Dura*, the complaint at issue alleged only that "'[i]n reliance on the integrity of the market, [the plaintiffs] . . . paid artificially inflated prices for Dura securities' and the plaintiffs suffered 'damage[s]' thereby." 544 U.S. at 340.

[13] *Id.* at 342.

[14] Of course, selling a stock at a loss does not necessarily prove a causal connection, since that loss could be based "not [on] the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events . . . ." *Id.* at 343.

[15] *Id.* at 346–47 (describing "judicial consensus" that "a person who 'misrepresents the financial condition of a corporation in order to sell its stock' becomes liable to a relying purchaser 'for the loss' the purchaser sustains 'when the facts . . . become generally known' and 'as a result' share value 'depreciate[s].'" (quoting the Restatement (Second) of Torts § 548A, Comment b, at 107)); *see also, e.g.*, *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 611 (S.D.N.Y. 2009) ("[T]hat Class members have not yet sold their

No. 17-50702

infirmity in *Dura* was the "complaint's failure to claim that [defendant's] share price fell significantly after the truth became known."[16]

Here, Martone alleged exactly that: he "purchased and held shares of Whole Food's stock . . . during the Class Period," and "[w]hen the truth came out" about the alleged overcharging scheme, "the stock price fell." In doing so, he alleged an injury-in-fact sufficient to establish his standing to sue.

IV.

ERISA "protects participants in voluntarily established, private sector retirement plans . . . 'by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans.'"[17] It "provides that an employer who sponsors an employee plan may also serve as a fiduciary of that plan, and it imposes on the employer-fiduciary strict statutory duties, including loyalty, prudence, and diversification."[18] Companies may create ESOPs like the Company Stock Fund, which are "designed to invest primarily in qualifying employer securities."[19]

There is an inevitable tension between an employer-fiduciary's duty of prudence and the use of a fund primarily to invest in the employer's stock.[20] In *Fifth Third Bancorp v. Dudenhoeffer*, the Supreme Court attempted to navigate this tension and provide guidance on what a plaintiff must allege to

---

shares does not preclude a finding of loss causation."); *Ong ex rel. Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729, 743 (N.D. Ill. 2006) ("*Dura* held that a plaintiff must show economic loss and causation; the Court nowhere stated that the loss must be realized through a sale.").

[16] *Id.* at 347.

[17] *Whitley v. BP, PLC*, 838 F.3d 523, 526 (5th Cir. 2016) (quoting 29 U.S.C. § 1001(b)).

[18] *Id.* (internal quotation marks omitted).

[19] *Id.* (quoting 29 U.S.C. § 1107(d)(6)(A)).

[20] *See Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2465 (2014) ("On the one hand, ERISA itself subjects pension plan fiduciaries to a duty of prudence . . . . On the other hand, Congress recognizes that ESOPs are 'designed to invest primarily in' the stock of the participants' employer, meaning they are *not* prudently diversified.") (internal citations omitted) (emphasis in original).

7

## No. 17-50702

adequately state a claim for breach of the duty of prudence by an ESOP fiduciary on the basis of either public or inside information. With regard to a claim based on nonpublic information, the Supreme Court held that:

> [t]o state a claim for breach of the duty of prudence on the basis of inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it.[21]

In *Amgen, Inc. v. Harris*, the Supreme Court clarified that a complaint must allege "that a prudent fiduciary in the same position 'could not have concluded' that the alternative action 'would do more harm than good.'"[22] In *Whitley*, we read these cases to say that "the plaintiff bears the significant burden of proposing an alternative course of action so clearly beneficial that a prudent fiduciary *could not conclude* that it would be more likely to harm the fund than to help it."[23]

In his Amended Complaint, Martone suggests three alternative actions that he claims meet the requirements of *Dudenhoeffer* and *Whitley*. First, he asserts that Defendants could have "temporarily clos[ed] or fr[ozen] the Company Stock Fund . . . until . . . Whole Foods stock again became a prudent investment." Second, he claims that Defendants could have "effectuated corrective, public disclosures to cure the fraud . . . thereby making Whole Foods stock . . . an accurately priced, prudent investment again." Third, he suggests that Defendants could have "divert[ed] some of [the] Company Stock Fund's holdings into a low-cost hedging product that would behave in a countercyclical fashion vis-à-vis Whole Foods stock."

---

[21] *Id.* at 2472.

[22] *Amgen, Inc. v. Harris*, 136 S. Ct. 758, 760 (2016) (quoting *Dudenhoeffer*, 134 S. Ct. at 2463).

[23] *Whitley*, 838 F.3d at 529 (internal quotation marks omitted) (emphasis in original).

No. 17-50702

A.

Martone suggested the first two alternatives—a temporary freeze or an earlier public disclosure—in his original Complaint. Relying on *Whitley*, the district court held that neither proposed action sufficed because "where both alternatives proposed would make the stock price drop[,] a prudent fiduciary could very easily conclude that such actions would do more harm than good."[24]

In his Amended Complaint, Martone attempts to revitalize these proposed alternatives and to distinguish this case from *Whitley*, alleging (1) that defendants knew or should have known that "the longer a fraud goes on, the more damage it does to investors," and (2) that during the Class Period, the Plan was a net purchaser of Whole Foods stock.

1.

First, Martone contends that Defendants should have known that "the longer a fraud of a public company like Whole Foods persists, the harsher the correction is likely to be when that fraud is finally revealed." Thus, he argues that they should have disclosed the alleged fraudulent conduct earlier to reduce the damage. Martone bolsters this argument with a number of statements about general economic principles, claiming that "in virtually every fraud case, the longer the fraud persists, the harsher the correction tends to be, usually because a prolonged fraud necessarily means that long-term damage is also done to a fraudster's reputation for trustworthiness."

---

[24] In *Whitley*, the plaintiffs alleged that BP stock was "overvalued" because "BP had a greater risk exposure to potential accidents than was known to the market." *Whitley*, 838 F.3d at 529. The plaintiffs alleged two alternative actions that the fiduciaries could have taken: (1) "disclosure of [accident risk] information to the public" and (2) "freezing trades of BP stock." *Id.* at 529. We noted that both of these proposed actions "would likely lower the stock price," and said that "it seems that a prudent fiduciary could very easily conclude that such actions *would* do more harm than good." *Id.* (emphasis in original).

No. 17-50702

The district court found this argument unpersuasive. It first noted that this type of generalized allegation "is not the sort of specific factual allegation that can distinguish this case, but an alleged economic reality." Put another way, if this principle applies "in virtually every fraud case" as Martone alleges, then it would have been true in *Whitley*, where the Fifth Circuit "nevertheless found that a prudent fiduciary could easily conclude that taking an action that might expose fraudulent conduct might do more harm than good." On that basis, the district court considered itself bound by *Whitley* to reject this argument.

On appeal, Martone criticizes the district court for "ignoring" his arguments regarding the potential for a slower recovery. He argues that the greater risk of "reputational penalty" is a "critical factor[] that a prudent fiduciary would have considered in deciding whether to effectuate corrective disclosure." Martone asserts that "Whole Foods' stock price clearly suffered such a penalty," as evidenced by a "harsher price correction" and "a far longer and slower recovery of the stock price thereafter."

Defendants argue that the allegations are too generic to meet the requisite pleading standard, noting that Martone's counsel has made essentially the same argument for early disclosure in ERISA actions against other companies in other jurisdictions.[25] Defendants further claim that Whole Foods sought to properly and fully investigate the alleged fraud, and that a prudent beneficiary "could have believed any of the alternatives would do more harm to the fund than good because each would result in a public disclosure depressing the stock price . . . before a full investigation had concluded."

---

[25] *See, e.g.*, *Jander v. IBM*, 272 F. Supp. 3d 444, 449–51 (S.D.N.Y. 2017); *Price v. Strianese*, No. 17-cv-652, 2017 WL 4466614 at *7–8 (S.D.N.Y. Oct. 4, 2017); and *Graham v. Fearon*, No. 16-cv-2366, 2017 WL 1113358 at *4– 5 (N.D. Ohio Mar. 24, 2017)).

No. 17-50702

We agree with the district court. If these "economic principles" are as widely-known and generally-applicable as Martone contends, then they must have applied with equal force in *Whitley*. Thus, these claims cannot be used to get around *Whitley*'s reach.

2.

Martone also alleges that "[d]uring the Class Period, the Plan was a net buyer of Whole Foods stock" with purchases outpacing sales by $34 million. According to Martone, a prudent fiduciary should have realized that the Plan was going to be a net purchaser of stock, and should have factored that into its analysis about whether early disclosure would do more harm than good. Martone intends this allegation to refute any claim that the Defendants' actions could have been justified by the potential *benefit* of an overvalued stock to those *selling* the stock. Because the Plan was a net purchaser, any potential benefit to sellers would have been outweighed by harm to buyers.

The district court found that "while this allegation is the sort of specific factual allegation necessary to support a proposed alternative action, it still falls short of meeting Plaintiff's burden." The court first noted that any time a company discloses fraud, there is a risk that the market could overcorrect. It then found that "[i]n light of *Whitley*, it would be difficult to conclude that any alternative action that indisputably lowers the company's stock price—possibly even more than warranted—would be 'so clearly beneficial'" that a prudent fiduciary "could not conclude that it would be more likely to harm the fund than to help it."

The court also noted that Martone's argument benefitted from hindsight because no one could have known, at the beginning of the Class Period, whether the Plan would be a net purchaser or net seller of Whole Foods stock. On appeal, Martone challenges this characterization. He argues that fiduciaries "are, in fact, in the business of trying to predict the future" and that

No. 17-50702

Defendants should have predicted that the Plan would be a net purchaser and should have factored that into their analysis about when to disclose.

Martone again fails to escape the requirements of *Dudenhoeffer* and *Whitley*. While a prudent fiduciary might have looked at purchasing trends, no fiduciary could have known with certainty that the Plan would be a net purchaser over the course of the Class Period. And even if a prudent fiduciary could have predicted that the Plan would be a net purchaser over time, that fact alone does not show that an earlier disclosure would be "so clearly beneficial" that no prudent fiduciary would consider it more likely to harm than help. As Defendants rightly note, an unusually-timed disclosure risks "spooking the market," creating the potential for an outsized stock drop. A prudent fiduciary could have concluded that such a risk outweighed the potential benefits of an earlier disclosure, regardless of the Plan's status as a net purchaser.

## B.

In the Amended Complaint, Martone also suggested a new alternative action, claiming "[D]efendants could have used their authority as fiduciaries to divert some of Company Stock Fund's holdings into a low-cost hedging product that would behave in a countercyclical fashion vis-à-vis Whole Foods stock."[26]

---

[26] In the Amended Complaint, Martone provides general details about how such a hedging product would work, asserting:

> Available hedging products are structured as irrevocable trusts which pool funds together from a group of financially healthy and diverse companies for a fixed period of time. Applicants are thoroughly screened and vetted for the benefit and protection of other participating companies. The trust is managed by an independent third party. During a fixed time period, the pooled funds are invested in safely and securely, typically in United States Treasury securities. At the conclusion of the fixed period, the trust restores losses caused by declines in price of company stock.

Martone also alleges that the cost of participation would be "extremely low," requiring annual cash deposits of 1-2%, with the possibility of a significant refund if the trust is not required to restore any losses in a given year.

No. 17-50702

Martone asserts that such products have been available to ESOPs for several years and impose "very few transaction costs." Martone also claims that "because such hedging products are not derivatives, an ESOP's purchase of them does not qualify as a disclosable event under the federal securities laws." The Amended Complaint does not cite any authorities that back up this claim.

In deciding the motion to dismiss, the district court "accept[ed] as true . . . that such a product exists as described." It then concluded that:

> the only reasonable inference from [Martone's] factual allegations regarding the hedging product is that a prudent fiduciary could reasonably conclude that investing in such a product would do more harm than good, either because it would lead to disclosure of the reason for the hedge—the alleged overpricing scheme—or, at the least, public knowledge that the Company faced a substantial risk, and in either case risk a stock price drop in the future.

The court reached this conclusion after looking at the ERISA statute, which requires that notice be given to plan participants following a "qualified change in investment options"[27] and the Investment Committee Charter. The district court noted that Martone "wholly fails to address why a reallocation of the Fund from an investment solely in the company's stock to an investment including both the company's stock and the hedging product described in the amended complaint would not qualify as a 'qualified change in investment options.'" While the district court did not decide that notice would be required as a matter of law (because of remaining questions about how defendants could obtain such a product), it found that a prudent fiduciary "could conclude" that the proposed course of action, as alleged in the Amended Complaint, "would

---

[27] The statute defines a qualified change in investment options to include:
a change in the investment options . . . under which . . . the account of the participant or beneficiary is reallocated among one or more remaining or new investment options which are offered in lieu of one or more investment options offered immediately prior to the effective date of the change . . . .
29 U.S.C. § 1104(c)(4)(B)(i).

13

## No. 17-50702

require some sort of disclosure to Plan participants and risk causing a stock drop."[28] Thus, it concluded that Martone "failed to carry his burden of showing a plausible alternative course of action," and granted the motion to dismiss.

Martone argues on appeal that the district court erred in reaching this conclusion because it should have drawn all reasonable inferences in his favor at the motion to dismiss stage, and it "could just as easily have inferred" that a prudent fiduciary would not believe that he needed to disclose the purchase of a hedging product. Martone offers no explanation of how or why a fiduciary would reach that conclusion.

At the motion to dismiss stage, the court must accept all of Martone's factual allegations as true; however, this "tenet . . . is inapplicable to legal conclusions."[29] Whether a hedging product must be disclosed under securities laws is a legal question, and thus the court is not bound to accept Martone's claim that such a product need not be disclosed. It is difficult to assess the answer to this question without more details about the alleged hedging product. Because the Amended Complaint offers no explanation for why the hedging product would not need to be disclosed, Martone has at best alleged the existence of a hedging product which *may or may not* need disclosure. A prudent fiduciary could conclude that such a product would at least *risk* a disclosure, thus rendering it more likely to harm the fund than to help it. Accordingly, the hedging product—as alleged—is not a plausible alternative action sufficient to overcome the requirements of *Dudenhoeffer* and *Whitley*.[30]

---

[28] "In other words, while it is conceivable to the Court that there may be some way for Defendants to have purchased a product like the one described in Plaintiff's amended complaint without sending a notice to plan participants, based on the information the Court has about the proposed hedge from the amended complaint, it is simply not plausible."

[29] *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

[30] Defendants also argued that the undisclosed purchase of a hedging product could violate securities laws. Because we ultimately find that a prudent fiduciary could conclude

No. 17-50702

V.

Because Martone has failed to "plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it," we affirm the district court's dismissal of his claims.

---

that pursuit of a hedging product could do more harm than good, we need not address this issue.

15

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

September 26, 2018

Ms. Jeannette Clack
Western District of Texas, Austin
United States District Court
501 W. 5th Street
Austin, TX 78701-0000

　　　No. 17-50702　　Thomas Martone v. Walter Robb, III, et al
　　　USDC No. 1:15-CV-877

Dear Ms. Clack,

Enclosed is a copy of the judgment issued as the mandate and a copy of the court's opinion.

　　　　　　　　　　　　　Sincerely,

　　　　　　　　　　　　　LYLE W. CAYCE, Clerk

　　　　　　　　　　　　　By: _/s/ Renee McDonough_
　　　　　　　　　　　　　Renee McDonough, Deputy Clerk
　　　　　　　　　　　　　504-310-7673

cc:　Mr. Samuel Ethan Bonderoff
　　　Mr. Gregory John Casas
　　　Mr. James Hampton Skelton
　　　Mr. Jonathan L. Sulds
　　　Honorable Jesse Wadell Wainwright
　　　Mr. Jacob H. Zamansky